[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-15528

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 8, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-00109-CR-J-20-TEM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TERRANCE MATTHEWS,
a.k.a. Jack,
a.k.a. Say Jack,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 8, 2005)

Before TJOFLAT and HILL, Circuit Judges, and GRANADE[*], Chief District
Judge.

---

[*]Honorable Callie V. Granade, United States Chief District Judge for the Southern
District of Alabama sitting by designation.

TJOFLAT, Circuit Judge:

Following a jury trial in the United States District Court for the Middle District of Florida, Terrance Matthews was convicted of one count of conspiracy to distribute five or more kilograms of cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1) and two counts of obstruction of justice by intimidation of a witness in violation of 18 U.S.C. § 1512(b)(1). The district court sentenced Matthews to 292 months of imprisonment and ten years of supervised release on the conspiracy count and imposed concurrent sentences of ten years of imprisonment and three years of supervised release on each of the witness intimidation counts. On appeal, Matthews raises four issues:[1]

- whether wiretap evidence should have been excluded because the recordings were not sealed in compliance with 18 U.S.C. § 2518(8)(a);

- whether evidence of a telephone conversation not involving Matthews

---

[1] Matthews belatedly sought to challenge the constitutionality of his sentence in light of Blakely v. Washington, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). Briefing in this case was completed before Blakely was decided, but a little more than four months before oral argument Matthews sought permission to file a supplemental brief challenging the constitutionality of his guideline sentence in light of Blakely. That motion was denied, as required by circuit precedent. See, e.g., United States v. Curtis, 380 F.3d 1308 (11th Cir. 2004) (holding that we will not permit supplemental briefs raising Blakely claims that were not advanced in defendants' pre-Blakely initial briefs notwithstanding the fact that such claims were squarely foreclosed by circuit precedent prior to Blakely). But see United States v. Levy, 391 F.3d 1327, 1345-1347 & nn.15-17 (11th Cir. 2004) (Tjoflat, J., dissenting from the denial of rehearing en banc) (explaining that "this court is truly a minority of one on this issue" and collecting cases). Because we vacate Matthews's conviction, this issue is moot.

should have been excluded because it was hearsay, irrelevant, and unfairly prejudicial;

- whether there is sufficient evidence to sustain the witness intimidation convictions;

- whether the district court erred by admitting evidence of Matthews's 1991 arrest under Federal Rule of Evidence 404(b); and

Part I recounts the course of the proceedings in the district court. Parts II-V address Matthews's four claims. In Part V, we conclude that the district court committed error in admitting evidence of Matthews's 1991 arrest and that this error cannot be deemed harmless. For this reason, Matthews's convictions must be reversed.

I.

At trial, the Government presented evidence that Matthews was part of a significant, though somewhat informal and irregular, conspiracy to distribute cocaine in Jacksonville and Miami. DEA Agent Frank Orochena testified that the DEA began investigating the conspiracy in July 2000 when Nathaniel King, also known as "Peewee," offered to cooperate with them. Peewee was involved in the conspiracy as a courier. His job was to take cash from Jacksonville to Miami and then return to Jacksonville with cocaine for distribution there. Peewee's employer

3

was Linwood Smith, a major participant in the Jacksonville end of the conspiracy.

In August of 2000, Peewee and an undercover agent bought five kilograms of cocaine in Miami with cash provided by Linwood Smith. On the return trip to Jacksonville, the DEA seized the cocaine in a staged stop. Peewee was allowed to "escape" so that the investigation would not be compromised. The DEA was then able to obtain authorization for wiretaps on Linwood Smith's cell phone and two cell phones owned by Farrell Alston, a major supplier in Miami. Smith's phone was monitored for sixty days. During this time more than 6300 calls were intercepted, 319 of which were deemed "pertinent," i.e., related to the conspiracy. Matthews was not involved or mentioned in any of the pertinent conversations. Alston's phones were monitored for thirty days, and more than 2400 calls were intercepted, 106 of which were deemed pertinent. One of the intercepted conversations was between Matthews and Alston; Alston testified that he and Matthews were discussing the sale of a kilogram of cocaine during the call. Matthews's name was also mentioned briefly in a conversation between Alston and Jason Moore, another member of the conspiracy.

The DEA intercepted the Moore-Alston conversation at 5:21 P.M. on March 20, 2001. Near the end of the short call Moore told Alston that he would call "sa-ous" because he had "the number programmed." Alston testified that "sa-ous" was

4

one of Matthews's nicknames; thus, Moore was going to call Matthews because he had Matthews's phone number programmed on his phone. Moore also told Alston that he would "be on your end 'bout Thursday, Friday" and would "need power pellets." According to Alston, "power pellets" are ecstasy pills. Alston told Moore that he would "get that set up for [him] then."

An hour-and-a-half later, the Government intercepted the Matthews-Alston call. During their conversation, Matthews asked Alston whether "J" (Jason Moore) had called him. Alston said that he had. Matthews then asked whether Alston had "put [Moore] on . . . twenty-six street." Alston testified that "twenty-six street" was a code for the price of a kilogram of cocaine; thus, Matthews was really asking whether Alston had quoted Moore a price of $26,000 for a kilogram of cocaine. Alston replied, "[H]ell no I wouldn't give that to him for that." Matthews said, "Good. Just give it to me then." In other words, according to Alston, Matthews wanted Alston to give him the kilogram so that he could then sell it to Jason Moore.[2] At trial, Alston could not recall whether he actually sold Matthews this

---

[2] The conversation went as follows:

MATTHEWS:      "J" call you?
. . . .
ALSTON:        Who this, Jack?
MATTHEWS:      Yeah.
ALSTON:        Yeah he had call me.
MATTHEWS:      Oh, you told 'em something?
ALSTON:        What, a number?
MATTHEWS:      Yeah.

particular kilogram of cocaine.

In July and October 2001, the DEA arrested a number of members of the conspiracy. Among them were Farrell Alston, Anthony Wells, Shawn Richardson, James Brown, Antonio Austin, Jason Moore, and Rodney Cannon, all of whom eventually pled guilty and, pursuant to their plea agreements, cooperated with the Government and testified against Matthews.

Farrell Alston was the first of the conspirators to testify at trial. Alston testified to having sold more than 400 kilograms of cocaine during the course of

---

| | |
|---|---|
| ALSTON: | No, no, he ain't, ah, he ain't, ah he ain't ask me nothing 'bout that. |
| MATTHEWS: | Ah, when he ask you a number put him on, ah twenty-six street. |
| . . . . | |
| ALSTON: | Who gone, who gone, who ah, oh who gone do that? |
| MATTHEWS: | Ah, you said on twenty-six street. |
| ALSTON: | Shit, I a hell no wouldn't give that to him for that. |
| MATTHEWS: | Good. Just give it to me then. |
| ALSTON: | Alright. I wouldn't give that to him for that somebody down with me, dawg. |
| MATTHEWS: | So go more than that? |
| ALSTON: | You goddamn right. |
| MATTHEWS: | Where he at, twenty what? |
| ALSTON: | For him? |
| MATTHEWS: | Seven? |
| ALSTON: | No less. |
| MATTHEWS: | Oh okay, yeah, alright then. |
| ALSTON: | Oh where, where you at, L's house? |
| MATTHEWS: | Yeah, L's house. |
| ALSTON: | I'm getting off at the one-o-three right now. |
| MATTHEWS: | Yeah. Come by here. |
| ALSTON: | Alright. |

One of Matthews's nicknames is "Say Jack" or "Jack."

the conspiracy. As part of Alston's plea agreement, the Government filed a § 5K1.1 motion[3] on his behalf, which led to a five-level sentence reduction for substantial assistance.[4] Alston also received a three-level reduction for acceptance of responsibility. As part of the plea, the Government also declined to pursue any sentencing enhancements based on a firearm found on Alston at the time of his arrest. Alston was sentenced to 135 months in prison for his role in the conspiracy. Without the aforementioned reductions, his applicable guideline range was 324 to 405 months—235 to 293 months even taking into account in the reduction for acceptance of responsibility. The Government also filed a Rule 35[5] motion on his behalf that was pending at the time of Matthews's trial; Alston was hopeful that it would result in a further reduction of his sentence.

---

[3] "Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." U.S.S.G. § 5K1.1

[4] Throughout the opinion, we speak of various sentencing reductions, by which we mean reductions from the "base offense level" under the Federal Sentencing Guidelines for the offense to which the defendant pled guilty.

[5] Federal Rule of Criminal Procedure 35(b)(1) provides that "[u]pon the government's motion made within one year of sentencing, the court may reduce a sentence if: (A) the defendant, after sentencing, provided substantial assistance in investigating or prosecuting another person; and (B) reducing the sentence accords with the Sentencing Commission's guidelines and policy statements." All of the testifying co-conspirators faced ten-year statutory mandatory minimums. Rule 35(b)(4), however, provides that "[w]hen acting under Rule 35(b), the court may reduce the sentence to a level below the minimum sentence established by statute."

At trial, Alston testified to the following facts regarding the conspiracy. Alston and James Brown were partners in Miami, and Alston was introduced to Matthews through Brown. Alston was responsible for getting cocaine, and Brown had connections with buyers in Jacksonville, including Antonio Austin, Jason Moore, and Linwood Smith. At first, Alston and Brown used Peewee as a courier. Peewee would bring cash to Miami, and they would send twenty to forty kilograms of cocaine at a time back to Jacksonville. After Pewee "escaped" from the staged DEA stop, however, the Jacksonville customers began traveling to Miami to purchase the cocaine in person. Alston's main supplier was George Morales, but he also bought cocaine from Matthews a few times when Morales didn't have all that he needed. Specifically, he purchased cocaine from Matthews—usually five to ten kilograms, but once as much as twenty, at a price of $18,000 to $23,000 per kilogram—"no more than about five or ten times" in 1999 and 2000. He also sold Matthews one to three kilograms of cocaine on about five different occasions in 2000. He and Brown ceased doing business with Matthews, however, after he sold them some bad cocaine sometime in 2000.

After Alston was sentenced and incarcerated in federal prison in Miami, Matthews sent him four letters. The letters used pseudonyms, but Matthews stipulated that he wrote them, and Alston knew that they were from Matthews.

8

The first letter began, "I been hearing some bad things about you old boy and it's coming from some people that seems to know you well." It continued, "[T]he talk is that you have went bad for those folks and you are lying on anyone to get time cut . . . . [T]here is anuff brothers in there for nothing on the count of another brother telling a lie on them." Matthews also urged Alston not to "be another sucker for those folks." Alston understood this to mean that Matthews knew that he was cooperating with the Government and wanted him to stop. The letter also encouraged Alston "to seek the lord and pray and read that bible every day and ask him to show you a way to get closer to him so you could be a better man in christ"; Alston testified that he and Matthews had never discussed religion before.

The letter next stated:

> I know you heard about sleep got killed[;] he got shot up in the car one night[;] he died in the hospital a month later[;] thats why I say get your self right with the lord because we don't know when were leaving here but we won't to be right with Jesus.

"Sleep," also known as "Blind," owned a house in Miami where Matthews, Alston, and other members of the conspiracy met to drink, smoke marijuana, shoot dice, and hold dogfights. Alston understood Matthews to be advising him that he should get himself "right" with God because "you don't know when you're going to die." At this point, the Assistant United States Attorney (AUSA) followed up by asking, "And how did you take that? What did you understand that to mean?" Alston

9

explained, "I was taking it, you know, that I'm cooperating with the government, so [Matthews] might have been making threatening gestures." At the end of the letter, Matthews urged Alston not to "be a 'Judus.'"

In the second letter, Matthews again wrote that "sleep got shot up about four times" and urged Alston to keep praying and reading the Bible. He also wrote:

> I know you all ready know the talk on the streets is that you are putting [Matthews] in the mix[.] [W]hats up with that man[?] We all know that [Matthews] didn't have anything to do with you'll other than gambleing and fighting dogs man[.] I don't know but that's crazy too how that kid got indicted on that case with you all. Your son[6] say that you aint saying nothing on no one, but why is it so hard for you to help that man get out of this by just telling the truth to his attorney[?]

Alston understood Matthews to be asking him why he would not tell the Government that Matthews was not part of the cocaine conspiracy, since they both knew that to be the "truth." The letter then stated, "[I]f it was any one of us on the one you know it won't be a problem helping you if they put you in something over there that you had no business with." Matthews apparently meant that the people who hung out at Blind's house ("the one") would all be willing to help Alston if he were ever implicated in a crime he "had no business with."

In the third letter, Matthews wrote,

[Y]ou don't have your self together with God on believing in Jesus

---

[6] Alston's "son" was really a friend of Alston's known as "Tit."

10

Christ his son because if you did you will be trying to do the right thing and help a brother out . . . [Y]ou say you aint doing nothing to no one[,] but I don't need silence from you[.] I need . . . a true friend to help me out because you know it aint . . . like they are trying to put it. . . . I'm asking you for your consideration because you know the truth.

Alston understood this to be yet another request that he tell the Government that Matthews was not involved in the cocaine conspiracy, i.e., the "truth." At the end of the letter, Matthews added, "P.S. Sleep Died too!" and "Say Ough Love You!" "Say Ough" is one of Matthews's nicknames.

In the fourth letter, Matthews wrote, "I know you heard about old boy[;] that junk was mess up." Alston understood this to be yet another reference to Sleep's murder. He then wrote,

[T]hese folks is trying to lock say ough up[.] [W]hat's up with you[?] [A]re you doing what they say you are doing[?] . . . [Say ough] say he been trying to get in touch with you but you won't write back or nothing or talk to his lawyer[.] [H]e say the reason he in this mess is calling your phone and the folk think you'll are talking about something[.] [M]an you know that man didn't have anything to do with you all so way you not going to help that man out of these mess[.] [T]hat man sick[;] he don't know what to do[.] [Y]ou say you not telling nothing on him but you still not trying to help him by telling the truth[.] [H]ow will you feel if you got pick up for something on seven one[⁷] and you know you don't do nothing but gamble round there but the folks say you do something else and no one on seven one is trying to help you[?] . . . [I]t seems like I'm losing everyone I love from niggers lying on them[;] you know that's way sleep got shot up because a nigger step to him and said he was telling

_____

⁷ Blind's/Sleep's house was also known as the "seven one" because it was on 71st Street.

11

the folks on him and they had a fight and that same night he got shot up on the house . . . .

Alston interpreted this passage as yet another request that he cease cooperating and tell the Government that Matthews had nothing to do with the conspiracy. He understood the final quoted sentence to mean that Sleep had been killed because someone thought that he was cooperating with the Government.

After Alston finished going through all four letters line-by-line, the AUSA asked him what, in general, he understood the letters to be conveying to him. Alston answered, "Like when he found out that I was cooperating, he made me some threatening gestures."

James Brown testified next. Brown testified that he had sold "hundreds" of kilograms of cocaine during the course of the conspiracy. He pled guilty to conspiring to distribute between fifteen and fifty kilograms. After the Government filed a § 5K1.1 motion on his behalf, Brown received a sentencing reduction for substantial assistance, and he was sentenced to 168 months in prison. Without the § 5K1.1 motion, he was facing 262 to 327 months based on his substantial criminal history. The Government also filed a Rule 35 motion on his behalf that was pending at the time of Matthews's trial; Brown was hopeful that it would result in a further reduction of his sentence.

Brown's general description of his partnership with Alston was consistent

with Alston's testimony. According to Brown, he and Alston purchased ten or more kilograms of cocaine from Matthews "three or four times at the most" in 1998 and 1999. He also bought smaller quantities of cocaine from Matthews on two other occasions. The cocaine involved in the second purchase turned out to be bad; this was the same incident Alston testified to, and Brown also ceased doing business with Matthews thereafter.

The third conspirator to testify was Antonio Austin. Austin was sentenced to 188 months in prison for his role in the conspiracy. The Government filed a Rule 35 motion that was pending at the time of Matthews's trial; Austin was hopeful that it would result in a reduction of his sentence. At trial, Austin testified to the following facts concerning the conspiracy. Austin sold cocaine in Jacksonville at a rate of about two kilograms per week. His primary suppliers were Farrell Alston and James Brown in Miami. Peewee transported the cocaine from Miami to Jacksonville until he was stopped in August 2000; after that, Austin himself would go to Miami to get the cocaine. Austin met Matthews in late 1999 at Sleep's house and first bought cocaine from him—specifically, 1.5 kilograms for a price of $33,000—in December 2000 in a deal facilitated by James Brown. He also bought one kilogram from Matthews in February 2001 for $22,000. He witnessed Matthews deliver three kilograms of cocaine to Jason Moore on another

13

occasion.

Jason Moore, one of the primary dealers on the Jacksonville end of the conspiracy, was the fourth member of the conspiracy to testify. Prior to his indictment, Moore became concerned that Shawn Richardson, his "lieutenant," might be cooperating with the Government against him. To convince Richardson that cooperating was a bad idea, Moore had two associates—"Mullet" and "Bubba Ray"—"shoot up" Richardson's house. Richardson, his wife, and his daughter were all shot, but all three recovered. Eventually, Moore cooperated with the Government and pled guilty to distributing between fifteen and fifty kilograms of cocaine. Because of his substantial criminal history, Moore was sentenced to 324 months in prison. The Government filed a Rule 35 motion that was pending at the time of Matthews's trial; Moore was hopeful that it would result in a reduction of his sentence.

At trial, Moore testified to the following facts concerning the conspiracy. He also purchased cocaine from Alston and Brown and used Peewee as a courier until August 2000. He met Matthews in 1998 or 1999, and sometime in 1999 Matthews offered to supply him with cocaine at a lower price than Alston and Brown. He did, in fact, purchase two kilograms or so of cocaine from Matthews at Matthews's house several times in 1999, 2000, and 2001. On one of these

occasions, Anthony Wells and Shawn Richardson were with him in Miami, and he tried to transport the cocaine back to Jacksonville by putting it in the trunk of their rental car without telling them; however, Wells and Richardson discovered the cocaine before leaving Miami and refused to drive it back to Jacksonville, so Moore had to drive it back himself.

After Moore was sentenced and incarcerated in federal prison in Miami, he also received a letter from Matthews. Like the letters Alston received, this letter used a pseudonym, but Matthews stipulated that he wrote it, and Moore knew that it was from Matthews. In the letter, Matthews wrote, "I am not trying to call you a rat[,] . . . [but] those white folks are saying that you and a couple of your homeboys are going to comeback on my main man." Moore interpreted this to mean that although Matthews did not want to call Moore a "snitch," the Government (the "white folks") had told him that Moore was, in fact, cooperating against him. The letter also stated, "[S]leep got killed because they say he was working too[;] sleep had a fight with a nigger about that and then the next thing he got shot up in a car with this girl." Moore understood this to mean that Sleep had been killed because he was cooperating with the Government; that is, he understood Matthews to be suggesting that "if you snitch, you going to get killed sooner or later." The letter then asked, "[I]f you would have gotten indicted for something on seven one and

15

you know all you do is gamble around there you will be sick and you will won't to know what's up with those lying nigger wooden you?" In other words, Matthews wanted to know why he had been indicted when all he did at Sleep's house (the "seven one") was gamble. Matthews then reminded Moore that he had always treated him well in Miami. He also told Moore that he had a lot of friends in prison with him and that they had "sent word out about" him, which, according to Moore, meant that they were telling Matthews that Moore was cooperating against him. The letter then urged Moore not to cooperate and to "stay strong and read that bible and start praying." In closing, Matthews warned, "[W]hen that day come we will all see who is doing this to that boy because everyone is saying they are not talking or didn't put this kid in this[;] time will tell and I will be right there to see who really is a Judas."

Rodney Cannon was the fifth conspirator to testify. Cannon pled guilty to distributing one kilogram of powder cocaine and 150 to 500 grams of crack cocaine. After receiving a three-level reduction for acceptance of responsibility and a two-level reduction for his minor role in the offense, Cannon's guideline range was still 120 months (because he was facing a ten-year statutory mandatory minimum) to 135 months in prison. But because the Government then filed a motion on his behalf under 18 U.S.C. § 3553(e), Cannon also received a three-level

16

reduction for substantial assistance, and the court sentenced him to 78 months in prison for his role in the conspiracy.[8] The Government also filed a Rule 35 motion that was pending at the time of Matthews's trial; Cannon was hopeful that it would result in a further reduction of his sentence.

At trial, Cannon testified to the following facts regarding the conspiracy. He sold cocaine in Jacksonville at a rate of about four to six kilograms per month. Jason Moore was his primary supplier. Moore is also Cannon's brother. Cannon was aware that Moore got his cocaine from Miami—at first from Alston and Brown and, later on, from Matthews—and that Moore either brought it up from Miami himself or used a courier such as Peewee. Cannon estimated that he and Moore purchased a total of about fifty kilograms of cocaine from Matthews in 1999, 2000, and 2001, although Cannon did not meet Matthews until March 2000. Cannon's trial testimony seems to describe only two specific transactions involving one to two kilograms of cocaine each. On both occasions, Matthews actually delivered the cocaine to Moore outside of Cannon's presence.

---

[8] Because Cannon's substantial assistance reduction put him under an otherwise applicable statutory mandatory minimum, the Government had to file its motion under 18 U.S.C. § 3553(e) ("Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense.") rather than simply under U.S.S.G. § 5K1.1. The same was true with respect to Shawn Richardson and Anthony Wells. At trial, however, the parties simply referred to the Government's motions as a § 5K1.1 motions.

Shawn Richardson batted sixth for the conspirators. Richardson was initially subject to a ten-year mandatory minimum sentence for his role in the conspiracy. The Government then filed a motion on his behalf under 18 U.S.C. § 3553(e), and he received a reduction for substantial assistance. He also received reductions for acceptance of responsibility and his minor role in the offense, and he was sentenced to only 48 months in prison. The Government also filed a Rule 35 motion that was pending at the time of Matthews's trial; Richardson hoped that the motion would lead to an additional sentence reduction.

At trial, Richardson testified to the following facts. He bought cocaine from Jason Moore and Linwood Smith—about four or five ounces a week at a price of $750 to $800 an ounce—and then resold it around Jacksonville. He ceased doing business with Moore, however, after Moore hid two kilograms of cocaine in the trunk of his rental car without his knowledge or permission. On that occasion, Richardson let Moore and Matthews borrow his car. When they brought it back, Moore gave him, Anthony Wells, and a friend of theirs named "Tiger" some gas money for their drive back to Jacksonville. When the three of them stopped for gas, however, they discovered the cocaine in the trunk. Richardson then called Moore and told him that he was not going to drive the cocaine to Jacksonville, so Moore drove the cocaine to Jacksonville himself. Richardson, Wells, and Tiger

18

then returned to Sleep's house and got a flight to Jacksonville the next day. At Sleep's house, Matthews told Richardson that he had told Moore that "there was too many of [them], there was too many to drive it back there like that there, man"; Richardson understood "it" to be the cocaine in the trunk.

Anthony Wells rounded out the Government's seven-conspirator lineup. Wells initially faced a statutory mandatory minimum of ten years in prison. The Government then filed a motion on his behalf under 18 U.S.C. § 3553(e), and he received a reduction for substantial assistance. He also received reductions for his minor role in the offense and acceptance of responsibility, and the court imposed a sentence of only 72 months in prison. The Government also filed a Rule 35 motion that was pending at the time of Matthews's trial; Wells hoped that it would lead to a further reduction in his sentence.

Wells sold cocaine and marijuana in Jacksonville. His suppliers were Linwood Smith and Jason Moore. Wells generally purchased cocaine from Moore on a consignment basis in ounce quantities at prices ranging from $650 to $850 an ounce. Rodney Cannon had told Wells that Moore, in turn, purchased cocaine from James Brown, Farrell Alston, and Terrance Matthews. Wells himself saw Matthews in Miami on two or three different occasions, although he never dealt with him directly. At trial, Wells also testified about the incident in Miami

19

involving the two kilograms of cocaine in the trunk of the rental car. His account of the incident was, in general, consistent with Richardson's. He testified that after they returned to Sleep's house Matthews told him and Richardson that he had "told Jason it wouldn't work," the "it" apparently being Wells, Richardson, and Tiger driving the cocaine back to Jacksonville.

After the conspirators finished testifying, the Government called two members of the Miami-Dade Police Department who testified about a 1991 incident involving Terrance Matthews. On December 31, 1991, the first officer received a tip that there was a black male selling drugs out of the back of a Chevrolet parked on a specific street corner in Miami. The officer located the car and three times observed Matthews take a small package out of the trunk, hand it to another individual, and take something in exchange for it. After the third exchange, Matthews and the package's recipient were arrested. The package contained cocaine, and Matthews had about $2000 cash on his person. The arresting officers then searched the Chevrolet's trunk and found 251 grams of cocaine, some marijuana, about $1500, and three guns. The drugs were all packaged for street sale. According to the second officer, Matthews was willing to talk and told them that he had "been in the game a while" but was just a "worker," not a "lieutenant." In other words, he had been involved in street-level drug sales

20

for some time but was still near the bottom of the drug-trade hierarchy.  His only

job was to resupply street-level sellers.

The officers' testimony was admitted under Federal Rule of Evidence 404(b)

as evidence of Matthews's "intent."  The jury was given the following instruction

(or a substantially similar one) three different times:

> You may consider [the Rule 404(b)] evidence not to prove that the
> defendant did the acts charged in the indictment, but only to prove the
> defendant's state of mind, that is, that the defendant acted with the
> necessary intent or willfulness and not through acts of mistake.
> Therefore, if you find, first, that the government has proved beyond a
> reasonable doubt that the defendant did, in fact, commit the acts
> charged in the indictment, and that the defendant also committed
> similar acts at other times, then you may consider those other similar
> acts in deciding whether the defendant committed the acts charged
> here willfully and intentionally and not through an accident or
> mistake.

During its closing argument, the Government argued that the 1991 incident

did, in fact, help to establish Matthews's "intent":

> The intent in 1991 that the defendant had was to distribute cocaine.
> He had those little baggies of cocaine in the trunk of his car and he
> was out there distributing it back in 1991.  And by the time of this
> charged conspiracy in 1999 through June of 2001, the defendant had
> that same intent.  He had the same intent to distribute cocaine, only
> now he was a bigger dealer.  He's dealing in kilograms of cocaine, not
> little baggies of cocaine any longer.

In his own closing argument, Matthews's counsel responded that the Government

had introduced the Rule 404(b) evidence precisely because it recognized the

21

dubious credibility of the witnesses on which its case rested. In rebuttal, the Government dismissed defense counsel's suggestion and maintained instead that the evidence was "important" to the issue of "intent":

> [T]he defense wants you to just kind of breeze over this 1991 incident. The 1991 incident is important. And it wasn't because the government was stretching and didn't think they had a strong enough case, that's what the defense would like you to think. That evidence is relevant and it's important for you to consider in determining the defendant's intent to distribute cocaine. The evidence shows the defendant's intent to distribute cocaine. That's why that evidence was introduced and that's why it was before you for your consideration.

The jury convicted Matthews on all counts—one count of conspiracy to distribute five or more kilograms of cocaine and two counts of obstruction of justice by intimidation of a witness.

## II.

Matthews first argues that the district court erred in admitting two telephone conversations—one between Jason Moore and Farrell Alston, and one between Matthews and Alston—because the recordings were not sealed in compliance with 18 U.S.C. § 2518(8)(a). In relevant part, that subsection provides:

> The recording of the contents of any wire, oral, or electronic communication under this subsection shall be done in such a way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. . . . The presence of the seal provided for by this subsection, or a satisfactory

22

explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom . . . .

Id. (emphasis added). The relevant order authorizing the interception of wiretap communications, entered on March 16, 2001, provided that it would terminate "upon attainment of the authorized objectives or, in any event, at the end of thirty . . . days." In its order denying Matthews's motion to suppress the wiretap evidence, the district court concluded that the order actually terminated when interceptions ceased on April 10, 2001, presumably because "authorized objectives" had been achieved at that time. The tapes were sealed two days later. The district court concluded that this two-day delay was "not unwarranted" in light of other business then occupying the court and the time required to package the tapes for sealing.

Three circuits have held that recordings are sealed "[i]mmediately upon the expiration of the period of the order" if they are sealed within one or two days of the expiration. United States v. McGuire, 307 F.3d 1192, 1204 (9th Cir. 2002); United States v. Wilkinson, 53 F.3d 757, 759 (6th Cir. 1995); United States v. Wong, 40 F.3d 1347, 1375 (2d Cir. 1994). We agree with this interpretation. The statute requires the Government to provide a "satisfactory explanation" for failing to seal the recordings "immediately." See United States v. Ojeda-Rios, 495 U.S. 257, 262-65, 110 S. Ct. 1845, 1849-50, 109 L. Ed. 2d 224 (1990). If we

23

interpreted "immediately" to mean anything less than one or two days, we would essentially transform the statute into a requirement that the Government seal the recordings before, rather than "immediately upon," the order's expiration. Indeed, when, as here, an order expires upon the achievement of "authorized objectives" rather than on a fixed date, it is technically impossible to seal the recordings before the expiration of the order; as such, reading "immediately" out of the statute would effectively extend the "satisfactory explanation" to every such case. Thus, we must give the term "immediately" some meaning. That being the case, we agree with the Second, Sixth, and Ninth Circuits that "within one or two days" is a reasonable, workable interpretation of that term. Accordingly, we conclude that the recordings at issue here were sealed "immediately upon expiration of the period of the order" within the meaning of the statute.[9]

## III.

We next address Matthews's arguments that relate to the Alston-Moore conversation specifically. Matthews argues that the conversation is inadmissible

---

[9] In its brief, the Government also argues that the tapes were sealed "before expiration of the thirty-day period described in the authorizing order." Although it is not framed as such, this argument necessarily challenges the district court's determination that the order actually terminated on April 10 and its implicit finding that the order's "authorized objectives" had been achieved at that point. We do not address this contention because we conclude that the tapes were sealed "immediately" even if the order terminated on April 10. For the same reason, we also do not address the Government's argument that it provided a "satisfactory explanation" for the delay even assuming that the tapes were not sealed "immediately."

24

hearsay because it was not "during the course and in furtherance of the conspiracy" to distribute cocaine. Fed. R. Evid. 801(d)(2)(E). His theory is that because Moore and Alston discussed an ecstasy sale, the conversation was in furtherance of a different, unrelated conspiracy to distribute ecstasy, of which he was not a member. On the same basis, he claims that the conversation was irrelevant under Federal Rule of Evidence 401. Finally, he argues that because Moore and Alston discussed "power pellets" (ecstasy) the evidence was unfairly prejudicial and should have been excluded under Rule 403. "We review the admission of [evidence under Rule 801(d)(2)(E)] for abuse of discretion, and the court's factual findings that the requirements of rule 801(d)(2)(E) were met under the clearly erroneous standard." United States v. West, 142 F.3d 1408, 1413 (11th Cir.1998), vacated on other grounds, 526 U.S. 1155, 119 S. Ct. 2042, 144 L. Ed. 2d 211 (1999). We also review the district court's application of Rule 401 and Rule 403 under an abuse of discretion standard. United States v. Tinoco, 304 F.3d 1088, 1121 (11th Cir. 2002).

Near the end of the Moore-Alston conversation, Moore tells Alston that he will call Matthews because he has Matthews's number programmed on his phone. An hour-and-a-half later, Matthews called Alston. Matthews first asked Alston whether Moore had called him, and Alston replied that he had. Matthews then

asked Alston whether he had told Moore "a number" and, more specifically, whether he had "put [Moore] on . . . twenty-six street." At trial, Alston testified that this was code and that Matthews was really asking whether he had offered to sell Moore a kilogram of cocaine for $26,000. Alston answered, "hell no I wouldn't give that to him for that." Matthews said, "Good. Just give it to me then." Alston agreed.

Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if it "is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." "[W]hen the preliminary facts relevant to Rule 801(d)(2)(E) are disputed, the offering party must prove them by a preponderance of the evidence." Bourjaily v. United States, 483 U.S. 171, 176, 107 S. Ct. 2775, 2779, 97 L. Ed. 2d 144 (1987). Matthews argues that the Government did not show that the Moore-Alston conversation was in "the course and in furtherance of [a] conspiracy" in which he was involved. We are not convinced, however, that the district court's finding to the contrary was error, much less clearly erroneous. To recap, Moore told Alston that he would call Matthews. When Matthews called Alston shortly thereafter, he asked Alston whether he had talked to Moore, and Alston said that he had. From the recording and the testimony at trial, it seems that Matthews then asked Alston whether he had

26

quoted Moore a price on a kilogram of cocaine. Moore said that he had not.

Matthews then asked whether Alston would sell the kilogram to him instead, and

Alston appears to have agreed to do so. In light of all this, it was perfectly

reasonable for the district court to conclude that Moore's statement to Alston that

he would call Matthews related to the cocaine conspiracy. Matthews is correct that

Moore and Alston also discussed ecstasy during the call. He is also correct that he

was not charged with distributing ecstasy. But we see no reason to think that the

Moore-Alston conversation could not have been "during the course and in

furtherance of" two different conspiracies. Accordingly, we reject the argument

that it was inadmissible hearsay.

For the same reason, we reject Matthews's claim that the evidence is not

"relevant." "'Relevant evidence' means evidence having any tendency to make the

existence of any fact that is of consequence to the determination of the action more

probable or less probable than it would be without the evidence." Fed. R. Evid.

401. Clearly, statements regarding Matthews made "during the course of and in

furtherance of the conspiracy" have some tendency to make Matthews's

participation in the conspiracy more probable. They tend to show a connection

between Alston, Moore, and Matthews, and, therefore, support trial testimony that

Alston and Moore were customers of Matthews and that Matthews was an

occasional customer of Alston.

Finally, we reject the argument that this evidence should have been excluded as unfairly prejudicial. Under Federal Rule of Evidence 403, "relevant[] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Matthews argues that he was unfairly prejudiced by the mention of ecstasy ("power pellets") in the Moore-Alston conversation. Most of the brief conversation, however, did not involve drugs. Only at the very end of the call did Moore tell Alston that he would be in Miami later that week and would "need power pellets"; Alston responded simply that he would "get that set up for [him] then." Given that several of the conspirators testified to substantial personal use of cocaine, marijuana, and ecstasy, any unfair prejudice resulting from this brief exchange could not possibly have "substantially outweighed" the probative value of the conversation. Therefore, the district court did not abuse its discretion by refusing to exclude the conversation on this ground.

IV.

We next address Matthews's claim that there was insufficient evidence to convict him under 18 U.S.C. § 1512(b)(1), which provides in relevant part that "[w]hoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, . . . with intent to influence, delay, or prevent the

28

testimony of any person in an official proceeding shall be fined . . . or imprisoned

not more than ten years, or both."[10]  The indictment charged that Matthews with

both "intimidation" and "corrupt persuasion"; however, because the jury was

instructed as to intimidation only, we will review the sufficiency of the evidence on

that theory only.[11]

"We review challenges to the sufficiency of the evidence de novo.  In so

doing, we view the evidence in the light most favorable to the Government, taking

all reasonable inferences and credibility determinations reached in the

Government's favor."  United States v. Maxwell, 386 F.3d 1042, 1050 (11th Cir.

2004) (citation omitted).  "The issue whether a communication is a threat is a

question of fact to be left to the jury."  United States v. Taylor, 972 F.2d 1247,

1252 (11th Cir. 1992).  "If a reasonable recipient, familiar with the context of the

---

[10] Although we reverse all of Matthews's convictions for the reasons stated in Part V, infra, "we must still rule on [his] sufficiency argument because if the . . . evidence presented by the government was insufficient to carry its burden of proof, then . . . retrial would be prohibited by the double jeopardy bar."  United States v. Khoury, 901 F.2d 948, 961 (11th Cir. 1990); see also, e.g., United States v. Palzer, 745 F.2d 1350, 1352 n.4 (11th Cir. 1984) ("[The defendant's] argument[] relating to the sufficiency of the evidence . . . would . . . entitle him to a judgment of acquittal . . . if successful.  Because retrial would then violate double jeopardy, we are compelled to address [his] claim[]. . . ." (emphasis added)).

[11] Although the court initially instructed the jury that 18 U.S.C. § 1512(b) made it a crime "to use intimidation toward and corruptly persuade with intent to influence, delay and prevent the testimony of a witness," it then further instructed that the defendant could be found guilty "only if [the Government] proved beyond a reasonable doubt . . . that the defendant used or attempted to use intimidation against [Moore and Alston]."  The district court never elaborated on the concept of "corrupt persuasion."

29

communication, would interpret it as a threat, the issue should go to the jury."

Martin v. United States, 691 F.2d 1235, 1240 (8th Cir. 1982), quoted in Taylor, 972 F.2d at 1251.[12]

While the evidence was not overwhelming, a number of statements in Matthews's correspondence to Alston and Moore convince us that it was more than sufficient for a reasonable jury to conclude that Matthews was attempting to intimidate Alston and Moore in order to prevent or influence their testimony. All five of the letters discuss Sleep's murder, and two specifically say that Sleep was killed because he was cooperating with the Government. All of the letters suggest that Matthews knew that the recipient was cooperating against him. Matthews reminded Alston that one can never predict exact time of his death. He also advised Moore that he had a lot of friends in the prison in which Moore was incarcerated. The jury was, of course, free to infer that Matthews was merely passing along news of Sleep's unfortunate demise, reflecting on the fleeting nature of human existence, and sending greetings to acquaintances on the inside. But they certainly were not required to do so. Matthews's sufficiency of the evidence challenge is, therefore, without merit.

V.

---

[12] Taylor and Martin addressed 18 U.S.C. § 876, which prohibits using the mails to make threatening communications.

A.

Finally, we turn to Matthews's claim that the district court erred by admitting Rule 404(b) testimony regarding his 1991 arrest. Federal Rule of Evidence 404(b) provides in relevant part that

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

In United States v. Beechum, 582 F.2d 898 (5th Cir. 1978) (en banc),[13] we explained that

> [w]hat the rule calls for is essentially a two-step test. First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of Rule 403.

Id. at 911.[14] Under this framework, we evaluate whether evidence of Matthews's 1991 arrest was admissible to prove "intent" in the instant case. The Government's

---

[13] In Bonner v. Prichard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[14] Obviously, extrinsic offense evidence is relevant only if the "offense was in fact committed and the defendant in fact committed it. Therefore, . . . the Government must offer proof demonstrating that the defendant committed the offense. If the proof is insufficient, the judge must exclude the evidence because it is irrelevant." Beechum, 582 F.2d at 912-13. Our more recent cases have addressed this issue as an independent step in their Rule 404(b) analyses; thus, the Beechum analysis now has three parts. See, e.g., United States v. Miller, 959 F.2d 1535, 1538 (11th Cir. 1992) (en banc). Matthews, however, does not contest the admission of the 404(b) evidence on this ground.

theory is that "Matthews's not-guilty plea placed directly at issue his intent to join the charged conspiracy to distribute cocaine." It explains that "Matthews's defense at trial that he did not participate in the alleged drug dealing focused squarely on intent" because he "did not attempt to deny that he knew and associated with the individuals testifying against him."

The problem with this theory is that is impossible for us to imagine a scenario under which the jury could have found that Matthews committed any of the acts described by his accusers and yet lacked the requisite guilty intent. The Government emphasizes that Matthews was charged with participation in a conspiracy, which can be difficult to prove. That this is often true, however, is no basis for admitting prior drug-related arrests whenever a conspiracy is alleged. "In order to prove a conspiracy to distribute cocaine, the Government must establish beyond a reasonable doubt: 1) the existence of an agreement among two or more persons; 2) that the defendant knew of the general purpose of the agreement; and 3) that the defendant knowingly and voluntarily participated in the agreement."[15]

---

[15] The jury in this case was correctly charged on conspiracy as follows:
In order to establish a conspiracy offense, it is not necessary for the government to prove that all of the people who were members had entered into any kind of formal agreement.
. . . .
Distribution is the transfer or attempted transfer of possession from one person to another.
What the evidence in this case must show beyond a reasonable doubt . . . is: First, that two or more persons in some way or manner came to a mutual

32

United States v. Simpson, 228 F.3d 1294, 1298 (11th Cir. 2000). Here, the

Government's witnesses testified to Matthews's participation in numerous large

cocaine deals in 1999, 2000, and 2001. The quantities involved ranged from a

single kilogram to as much as twenty kilograms at prices of $18,000 to $23,000 per

kilogram. Such conduct is not open to an innocent explanation; that is, there was

no room for Matthews to say, "Well, yes, I did those things, but I did not intend to

conspire to distribute cocaine." By the time the Government put on its 404(b)

evidence, it should have been clear that the Government's case would rise or fall

based on whether the jury believed Matthews had committed the charged acts at

all, not on whether he possessed the requisite guilty intent.

The Government argues that it "needed the extrinsic evidence to satisfy its

understanding to try to accomplish a common and unlawful plan [to distribute cocaine]; and, second, that the defendant knowing the unlawful purpose of the plan willfully joined in it.

A person may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names and identities of all the other alleged conspirators.

So if a defendant has a general understanding of the unlawful purpose of the plan, including the nature and anticipated weight of the substance involved, and knowingly and willfully joins in that plan on one occasion, that is sufficient to convict that defendant for the conspiracy even though the defendant did not participate before and even though the defendant only played a minor part.

Of course, mere presence at the scene of a transaction or event, or the mere fact that certain persons may have associated with each other and may have assembled together and discussed common aims and interests does not standing alone establish proof of a conspiracy.

Also a person who has no knowledge of a conspiracy but who happens to act in a way which advances some purpose of one does not thereby become a conspirator.

33

heavy burden" because its case "rested almost exclusively on the testimony of the cooperating defendants whose agreements with the United States and . . . own criminal behavior undercut their credibility—a matter thoroughly explored by Matthews at trial." We do not doubt that the Government thought that it needed the extrinsic offense evidence. But it is clear that they did not need it to prove intent. We cannot see how a juror would have found the witnesses' credible to the extent that they described buying large quantities of cocaine from Matthews on numerous occasions over a period of more than two years and yet doubted that Matthews did, in fact, intend to involve himself in conspiracy to distribute cocaine. The suggestion is preposterous. What the Government really means is that it "needed the extrinsic evidence to satisfy its heavy burden" because it feared that the jurors would not believe its witnesses at all. The Government wanted the jury to infer that Matthews was dealing drugs 1991 and was still dealing drugs in 1999, 2000, and 2001.[16] This is precisely the inference the law does not allow. See, e.g.,

---

[16] As noted above, in its closing argument, the Government argued that
> [t]he intent in 1991 that the defendant had was to distribute cocaine. He had those little baggies of cocaine in the trunk of his car and he was out there distributing it back in 1991. And by the time of this charged conspiracy in 1999 through June of 2001, the defendant had that same intent. He had the same intent to distribute cocaine, only now he was a bigger dealer. He's dealing in kilograms of cocaine, not little baggies of cocaine any longer.

The Government's references to "intent" are forced to the point of being ridiculous. If the jury believed that Matthews was, in fact, "dealing in kilograms of cocaine, not little baggies of cocaine any longer"—i.e., that he possessed two to forty pounds of cocaine, which he sold for $20,000 to $400,000—as the Government's witnesses testified, then there was no room for it to

34

People v. Zackowitz, 172 N.E. 466, 468 (N.Y. 1930) (Cardozo, C.J.) ("If a murderous propensity may be proved against a defendant as one of the tokens of his guilt, a rule of criminal evidence, long believed to be of fundamental importance for the protection of the innocent, must be first declared away.")

At oral argument, the Government essentially argued that evidence of prior drug dealing is admissible whenever a defendant pleads not guilty to conspiracy distribute drugs. The position taken seemed to be that the plea itself renders such evidence automatically admissible—subject, perhaps, to exclusion under Rule 403—regardless of the theory of the defense or the other evidence presented by the Government. This cannot be the law, and we take this opportunity to hold emphatically that it is not the law.

The Government's argument relies primarily on some expansive dicta from United States v. Diaz-Lizaraza, 981 F.2d 1216 (11th Cir. 1993). In Diaz-Lazaraza, the defendant (Diaz) and Frank Posada were arrested after Posada took delivery of two kilograms of cocaine from an undercover agent. Diaz drove Posada to the meeting place, but Posada and the agent then drove to the final transaction site in the agent's car, and Diaz drove off alone in the other direction. Diaz was arrested in a nearby convenience store parking lot shortly after Posada was arrested. At

conclude that he lacked the intent to distribute cocaine.

35

trial, the agent testified that he recognized Diaz's voice from an earlier telephone conversation setting up the sale, and the beeper the agent called to set up the meeting was found in the truck Diaz was driving. Diaz, however, claimed that he had simply driven Posada to the meeting place and was not involved in any drug-related activities. Id. at 1219-20 & 1224-25. Under these circumstances, we upheld admission of Diaz's prior arrest for possession of marijuana with the intent to distribute:

> In this case, far from stipulating to the requisite intent, Diaz's "non-participation" defense focused squarely on intent. The question in this case was not whether Diaz was present at the shopping center during the cocaine transaction with Agent Jordan; he clearly was. The question was why Diaz was at the shopping center during the transaction. Was he there in order to observe or supervise the transaction, or merely by coincidence? This is a question of Diaz's intent.
> However, even if Diaz's "non-participation" defense had not involved a question of intent, it still would not preclude the admission of evidence of Diaz's 1988 arrest to show criminal intent. A defendant's strategic decision not to focus the defense on the intent issue falls far short of a stipulation that the defendant possessed the requisite intent. Focusing the defense on an issue other than intent does not reduce the prosecution's burden to prove intent beyond a reasonable doubt. Likewise, it should not prohibit the prosecution from meeting that burden with otherwise admissible evidence.

Id. at 1225 (citation omitted).

The second quoted paragraph is dicta in the truest sense of the term, as it addresses a hypothetical case that was not before the court. See, e.g., United States

36

v. Eggersdorf, 126 F.3d 1318, 1322 n.4 (11th Cir. 1997) (defining "dicta" as language "not necessary to decide the case before us"). As such, it is not binding. E.g., Dantzler v. IRS, 183 F.3d 1247, 1251-52 (11th Cir. 1999). Nor is it persuasive.[17] To the extent that Diaz-Lizaraza suggests that even when intent is not realistically at issue it is necessary for the defendant to specifically stipulate to intent in order to avoid the introduction of Rule 404(b) evidence, see 981 F.2d at 1224-25, we do not agree. On one hand, if the defendant's intent is legitimately in issue, we doubt that he can avoid Rule 404(b) evidence simply by offering some abstract stipulation.[18] See Old Chief v. United States, 519 U.S. 172, 190, 117 S. Ct. 644, 655, 136 L. Ed. 2d 574 (1997). On the other hand, a formal stipulation in this case would have required an awkward and unnecessary jury instruction—for example, "You are instructed that the defendant denies conspiring to distribute cocaine; the parties have stipulated, however, that if the defendant did conspire to distribute cocaine, he did so knowingly and willingly." Such an instruction would

[17] As Judge Carnes has observed,
Somewhat like statements in a law review article written by a judge, or a judge's comments in a lecture, dicta can be used as a vehicle for offering to the bench and bar that judge's views on an issue, for whatever those views are worth. The persuasiveness of the rationale given can increase the weight accorded those views, but the fact that the views are formed and put forward in a context of a case in which they do not matter will always subtract from the weight given them.
McDonald's Corp. v. Robertson, 147 F.3d 1301, 1315 (11th Cir. 1998) (Carnes, J., specially concurring).

[18] This issue is not before us and this statement is not necessary to decide this case.

37

almost certainly confuse the jury and prejudice the defendant to at least some extent, and there is simply no need for it in a case such as this where the obvious issue is whether the defendant committed the acts alleged, not whether he had the requisite intent.

The Government also relies heavily on United States v. Delgado, 56 F.3d 1357 (11th Cir. 1995). In Delgado, we stated that

> [a] defendant who enters a not guilty plea makes intent a material issue, imposing a substantial burden on the government to prove intent; the government may meet this burden with qualifying 404(b) evidence absent affirmative steps by the defendant to remove intent as an issue. Hernandez presented a "mere presence" defense, forcing the government to prove his criminal intent so as to negate any innocent explanation for his presence. The other crimes evidence went to intent, not character.

Id. at 1365 (citation omitted). Thus, just as in Diaz-Lazaraza, the 404(b) evidence in Delgado was necessary to dispel the defendant's "innocent explanation for his presence." The other cases cited by the Government are similarly inapposite. See, e.g., United States v. Calderon, 127 F.3d 1314, 1330 (11th Cir. 1997) ("The trial judge admitted the evidence for the limited purpose of establishing . . . intent . . . which he found had been put in issue by [the defendant's] not guilty plea and by his defense that he was merely present at the scene of the drug activity in order to give his brother . . . a ride."); United States v. Pollock, 926 F.2d 1044 (11th Cir. 1991) (theory of the defense: defendant did not know there was cocaine in his

38

rented car); United States v. Cardenas, 895 F.2d 1338, 1342-44 & nn.3-4 (11th Cir. 1990) (holding that extrinsic offense evidence was admissible to prove intent where "the prosecutor stated that she anticipated [the defendant] would deny his intent to be involved in the charged offense" and "defense counsel did not even mention that he would refrain from contesting the intent issue");[19] United States v. Hicks, 798 F.2d 446, 447-48, 450-52 (11th Cir. 1986) ("intent was clearly at issue" where defendant and a former co-defendant were stopped on a boat carrying five pounds of cocaine); United States v. Wyatt, 762 F.2d 908, 909 (11th Cir. 1985) ("Wyatt asserted in defense that he was acting in his capacity as honorary deputy for the county Sheriff's Department. He argues that all of his . . . involvement in the conspiracy [was] directed toward enticing the conspirators to land a plane laden with marijuana at . . . a public airstrip run by Mr. Wyatt. Wyatt contends that,

---

[19] When pressed at oral argument, the Government cited Diaz-Lizaraza and Delgado as the best cases for its position, but Cardenas is probably better. In Cardenas, a Government witness testified that the defendant, Cardenas, had delivered cocaine to him at a Gainesville, Florida, health club on a single occasion. Cardenas denied any involvement in the transaction. Prior to trial, the Government apparently argued that it should be allowed to introduce 404(b) evidence to prove intent because it anticipated that Cardenas would dispute his intent to distribute cocaine even if the transaction were proved. See Cardenas, 895 F.2d at 1340-43. In response, the "defendant took no affirmative steps to indicate that lack of intent would not be a defense in the case." Id. at 1343. Given that the charged conduct involved only a single delivery, it is possible that it would have been open to an innocent explanation, i.e., the defendant did not realize that the substance he delivered was cocaine. See id. at 1343-44. In such a case, if the defendant does not even suggest that he will "refrain from contesting the intent issue," id. at 1342 n.4, then it is not an abuse of discretion for the district court to admit the evidence. But this is not such a case. Matthews's accusers testified that he sold large quantities of cocaine for hundreds of thousands of dollars over a period of several years. Such conduct simply is not open to any plausible innocent explanation.

39

pursuant to a prior agreement with Sheriff Gunnells, if he provided information to the Sheriff's Department leading to the seizure of an airplane containing contraband, the proceeds from the sale of the airplane would be used to buy a helicopter. Wyatt would then be retained to maintain and fly the helicopter for the Sheriff's Department. At trial, Sheriff Gunnells corroborated Wyatt's claim about a prior agreement.").

"Where intent . . . is a necessary conclusion from the act, and the act charged is not equivocal, proof of other offenses, even though similar in nature, will not be permitted." M.C. Slough & J. William Knightly, Other Vices, Other Crimes, 41 Iowa L. Rev. 325, 328-29 (1956) (citing People v. Lonsdale, 81 N.W. 277 (Mich. 1899)), cited in Fed. R. Evid. 404(b) advisory committee's notes. Put simply, if the conduct charged is not open to a plausible innocent explanation, then extrinsic offense evidence is not admissible to show intent. At a minimum, the Government must be able to give the court a scenario in which the jury might find that the defendant committed some or all of the acts alleged and yet lacked the requisite criminal intent. If it cannot do so, its case must, as it should, rise or fall on the strength of its evidence that the defendant committed the charged acts. In the instant case, there is no way that a jury could have doubted that Terrance Matthews knowingly and willfully entered into a conspiracy to distribute cocaine if it found

40

beyond a reasonable doubt that he did what his alleged co-conspirators said he did.

Accordingly, evidence of Matthews's 1991 arrest could have served no purpose

other than to prove a criminal propensity, and its admission was an abuse of

discretion.[20]

B.

The Government urges that we should nevertheless affirm Matthews's

conviction because any error in admitting evidence regarding his 1991 arrest was

---

[20] Our holding can be stated either of two ways. First, given that the charged conduct simply was not open to an innocent explanation, the 404(b) evidence was not plausibly "relevant" to the issue of intent. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. If Matthews committed the acts alleged, then he obviously intended to conspire to conspire distribute cocaine; conversely, if he did not commit those acts, it is equally clear that he did not intend to conspire to distribute cocaine. As such, the 404(b) evidence added nothing on the issue of intent—i.e., it does nothing to make it "more probable" that Matthews intended to conspire to distribute cocaine. It may well be that the evidence makes it more likely that Matthews actually did distribute cocaine. But it is relevant in this sense only because it tends to show criminal propensity and to suggest conformity therewith. This is precisely the (arguably relevant) purpose and inference the rule forbids, and it was, therefore, an abuse of discretion for the district court to admit the evidence.

Second, even starting with the abstract proposition that past instances of drug dealing may be relevant to show whether a defendant intended to conspire to distribute drugs on a later occasion, when, as here, the charged conduct is not open to an innocent explanation, the "incremental probity" of the past drug dealing is virtually nil. In Beechum, we emphasized that

[p]robity in this context is not an absolute; its value must be determined with regard to the extent to which the defendant's unlawful intent is established by other evidence, stipulation, or inference. It is the incremental probity of the evidence that is to be balanced against its potential for undue prejudice.

582 F.2d 898, 914 (footnote omitted). Here, because logic compels that intent be inferred from any or all of the acts alleged, the 404(b) evidence's incremental probity was zero. In contrast, the danger of unfair prejudice was considerable. Accordingly, the evidence's admission was also an abuse of discretion under the Rule 403 stage of the Beechum analysis. See Beechum, 582 F.2d at 911, 914-17; see also United States v. Jackson, 339 F.3d 349, 354-57 (5th Cir. 2003).

41

harmless. See 28 U.S.C. § 2111; Fed. R. Crim. P. 52(a); Fed. R. Evid. 103(a). "[E]videntiary and other nonconstitutional errors do not constitute grounds for reversal unless there is a reasonable likelihood that they affected the defendant's substantial rights; where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." United States v. Hawkins, 905 F.2d 1489, 1493 (11th Cir. 1990). If, however, we "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." Kotteakos v. United States, 328 U.S. 750, 765, 66 S. Ct. 1239, 1248, 90 L. Ed. 1557 (1946). The question is not "merely whether there was enough to support the result, apart from the phase affected by the error." Id. The question is "whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." Id. The Government bears the burden of persuasion on this issue. See United States v. Olano, 507 U.S. 725, 734, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993).

The error committed here cannot be deemed harmless. There is at least a "reasonable likelihood" that it had an effect on the jury verdict. Consequently, we are "left in grave doubt" as to whether the error influenced the jury, and we

42

certainly "cannot say, with fair assurance," that it did not.  As noted above, the Government itself argues that it "needed the extrinsic offense evidence to satisfy its heavy burden" because its case "rested almost exclusively" on the dubious credibility of its witnesses.

As described in Part I, most of the testifying co-conspirators had already received significant sentence reductions for substantial assistance, and all had Rule 35 motions hanging over their testimony.  On cross-examination, Matthews's counsel also brought out the fact that all these witnesses had been incarcerated in close proximity to one another for several months at the same small county jail.  In his closing argument, he used this fact to argue that surely this was enough time for them to "get 15, 20, 30, 40 minutes' worth of story together" for trial.  The Government's suggestion that they had not even discussed their testimony all those months because they had been instructed not to was, he argued, "almost laughable, . . . an insult."

For the Government to prove its case beyond a reasonable doubt, it needed some glue to hold its witnesses' stories together.  It had Matthews's phone call to Alston.[21]  The two seem to be discussing a drug deal, and Alston testified that they

---

[21] The Government also introduced the Alston-Moore conversation in which Moore said that he would call Matthews because he had Matthews's number programmed on his phone. This call does show that Moore, Alston, and Matthews knew one another, but Matthews did not contest this much at trial.  Consequently, this call did relatively little to support the testimony of

43

were, in fact, discussing the sale of a kilogram of cocaine—although he could not remember at trial whether that deal ever actually took place. However, this single call and the testimony of Matthews's alleged co-conspirators were essentially all the Government had to rely on. This might have been enough to solidify the Government's case. But we cannot know whether it was enough because the Government itself was concerned that it was not and thus sought to introduce evidence of Matthews's 1991 arrest. Despite the district court's limiting instruction, it seems fairly likely to us that the Government's witnesses seemed credible to the jury only because Matthews had been caught dealing drugs once before. Indeed, despite her strained references to intent, this is essentially the inference the AUSA suggested to the jury when, during her closing argument, she argued,

> The intent in 1991 that the defendant had was to distribute cocaine. He had those little baggies of cocaine in the trunk of his car and he was out there distributing it back in 1991. And by the time of this charged conspiracy in 1999 through June of 2001, the defendant had that same intent. He had the same intent to distribute cocaine, only now he was a bigger dealer. He's dealing in kilograms of cocaine, not little baggies of cocaine any longer.

Considering all the remaining evidence without the taint of the evidence that was erroneously admitted, it is impossible for us to say with any degree of confidence

---

the testifying co-conspirators regarding Matthews's involvement in the conspiracy.

that the error did not substantially influence the jury's decision.

## VI.

For the foregoing reasons, Matthews's convictions are

REVERSED.