**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jorge Humberto DIAZ–LIZARAZA,
Defendant–Appellant.**

No. 91–5719.

United States Court of Appeals,
Eleventh Circuit.

Jan. 27, 1993.

Joel Kaplan, Miami, FL, for defendant-appellant.

William C. Healy, Linda Collins Hertz, Lisa T. Rubin, Anne Ruth Schultz, Howard S. Dargan, Asst. U.S. Attys., Miami, FL, for plaintiff-appellee.

Before FAY, DUBINA and CARNES, Circuit Judges.

FAY, Circuit Judge:

Defendant Jorge Diaz–Lizaraza was convicted of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Diaz appeals the trial court's denial of his motion to suppress evidence discovered after federal customs agents pulled Diaz's truck over following a controlled delivery of cocaine to his co-conspirator, Frank Posada. Because we find that the initial stop of Diaz was a legitimate *Terry* stop and that the subsequent searches of Diaz's truck and belongings were reasonable, we affirm the trial court's ruling. Diaz also appeals the trial court's ruling admitting evidence of Diaz's 1988 arrest for possession of marijuana with intent to distribute to show Diaz's intent to commit the charged offenses. Because this extrinsic evidence was relevant to the material issue of Diaz's intent, we affirm this ruling also.

## FACTS

On September 4, 1990, customs agents in Miami arrested a cruise ship crew member named Cristobal Valencia as he attempted to smuggle two kilograms of cocaine into the United States in his sneakers. After his arrest, Valencia cooperated with the agents by contacting the owner of the cocaine, as he originally had been instructed to do upon reaching Miami. Valencia told the owner of the cocaine that his ship's imminent departure from the Port of Miami prevented him from delivering the cocaine as planned. Valencia suggested that his brother-in-law, "Tony," deliver the cocaine instead, and gave "Tony's" beeper number. "Tony" actually was an undercover agent named Jordan.

The owner of the cocaine called Jordan and told Jordan that his associate in Miami would contact him soon, using a code phrase and the beeper code number "44." On September 10, Agent Jordan received a call on his undercover beeper; the caller left a phone number followed by the code number "44." When Agent Jordan returned the call, he discovered that the number connected him with another beeper. In fact, it turned out to be defendant Diaz's beeper. After Jordan left his telephone number on Diaz's beeper, an individual identifying himself as "George" and reciting the prearranged code phrase called Jordan to arrange a meeting. As we discuss below, Agent Jordan later recognized the voice of "George" on the telephone as that of Diaz.

After several phone calls, Jordan and "George" agreed to meet at a Miami shopping center the next afternoon, and "George" gave a physical description of himself so Jordan could recognize him. The next day, Jordan and several other customs agents positioned themselves around the shopping center parking lot to await "George's" arrival. At the agreed-upon time, a white Ford and a blue truck entered the parking lot. Defendant Diaz later was identified as the driver of the truck; his co-conspirator Frank Posada drove the Ford. Diaz pulled the truck next to the Ford and spoke with Posada, but the agents could not hear the conversation. After Diaz motioned to Posada, the men parked their vehicles in different areas of the lot.

When Posada exited his car, the agents saw that he exactly matched the physical description of "George." Posada approached Jordan, recited the code phrase, and suggested that they conduct the transaction elsewhere. Jordan and Posada drove two blocks to another shopping center, where Jordan delivered the cocaine-laden sneakers to Posada in exchange for a $6,000 transportation fee. As Posada walked from Jordan's car back toward the shopping center where his car was parked, two customs agents arrested him.

Meanwhile, as Posada and Jordan had gotten into Jordan's car to drive to the transaction site, Diaz had exited the parking lot. Diaz first drove to a separate parking lot near where Jordan and Posada exchanged the money and cocaine. Coincidentally, Diaz parked directly behind one of the federal surveillance cars. When the agent left to provide back-up for Posada's arrest, Diaz also drove away, going in the opposite direction of the Posada arrest. Although agents suspected that Diaz was involved in the transaction, they had to abandon surveillance of Diaz to provide back-up for Posada's arrest. However, even though he was not actively surveilling Diaz, an Agent Anaipakos observed Diaz's truck pass the shopping center where Posada was several times.

Because Agents Jordan and Anaipakos were suspicious of Diaz's unusual activities, they followed his truck and stopped him in a nearby convenience store parking lot after Posada was arrested. Diaz's truck moved backward, striking the agents' car. Diaz then exited his truck and made a move toward his hip. Suspecting a concealed weapon, Jordan and Anaipakos exited their car with weapons drawn. After a pat down of Diaz revealed only a beeper, the agents reholstered their guns. The agents did not handcuff Diaz or remove his beeper, but they did ask his name, nationality, and home address. When Diaz responded, Agent Jordan immediately recog-

nized his voice as that of "George" from the telephone conversations arranging the transaction.

Agent Anaipakos asked for and received permission to search Diaz's truck. As Anaipakos searched the cab of the truck, Jordan advised Diaz of his *Miranda* rights. As the search of Diaz's truck revealed nothing, Anaipakos momentarily left the scene to move his car, which was blocking the entrance to the convenience store parking lot. While Anaipakos moved his car, Jordan again patted down Diaz. This time, however, Jordan did not find the beeper that Diaz wore previously.

When Agent Anaipakos returned to Diaz's truck to complete the search, he saw on the floor of the truck the beeper that Diaz had been wearing moments before. Although the beeper had been functional when Diaz was wearing it, at this time the bottom of the beeper was unfastened and the batteries had been removed. A third customs agent who had arrived on the scene picked up the beeper and reinserted the batteries. He dialed the number that Jordan had dialed to contact "George," and the beeper sounded. After achieving the same result a second time, the agents placed Diaz under formal arrest.

After formally arresting Diaz, the agents searched the belongings on Diaz's person. In his wallet and address book, the agents found two scraps of paper bearing Agent Jordan's undercover beeper number and the code number "44." On one of the scraps of paper, the name "Tony" also was written.

## DISCUSSION

 Diaz appeals the trial court's denial of his motion to suppress evidence discovered after Agents Jordan and Anaipakos stopped him in the convenience store parking lot. Diaz claims that the initial

1. Diaz also argues that the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.* (1988), requires suppression of evidence of the beeper's sounding because the agents illegally intercepted the transmission from the phone to Diaz's beeper. We reject this argument without extensive discussion because the Act simply does not apply to parties to the transmission.

stop was unreasonable because the agents lacked probable cause or a reasonable suspicion of criminal activity, as required by the Fourth Amendment. Diaz further contends that the search of his truck was impermissible because his arrest was not supported by probable cause, his consent to the search was not voluntary, and the search exceeded the scope of his consent. Diaz also argues that the activation of his beeper and the searches of his wallet and address book were unreasonable because agents lacked probable cause to arrest him. Therefore, Diaz argues, the trial court should have suppressed testimony that Agent Jordan recognized his voice, testimony that his beeper sounded when the agents dialed "George's" number,[1] and evidence of the scraps of paper bearing Agent Jordan's undercover beeper number.

 In considering the ruling on the motion to suppress, we review the district court's findings of fact for clear error. The district court's application of law to those facts is subject to de novo review. *United States v. Franklin*, 972 F.2d 1253, 1256 (11th Cir.1992). We find no error in the trial court's factual findings or legal conclusions and affirm the trial court's denial of Diaz's motion to suppress.

### Investigatory Terry Stop

 Law enforcement officers may briefly detain a person for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged, or is about to engage, in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The *Terry* rationale allows police to stop a moving car based on a reasonable suspicion that its occupants are violating the law. *United States v. Williams*, 876 F.2d 1521, 1524 (11th Cir.1989). The reasonable suspicion required for a *Terry* stop is more than

*United States v. Meriwether*, 917 F.2d 955, 962 (6th Cir.1990); *United States v. Basey*, 816 F.2d 980, 992 n. 21 (5th Cir.1987). In this case, the agents lawfully possessed the beeper and essentially called themselves. The agents were not merely a party to the transmission; they were the *only* party to the transmission. Therefore, the agents did not intercept a transmission.

a hunch, at least "some minimal level of objective justification," taken from the totality of the circumstances. *United States v. Sokolow*, 490 U.S. 1, 7–8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *I.N.S. v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984)).

In this case, Agents Jordan and Anaipakos possessed a reasonable suspicion that Diaz was involved with co-defendant Posada in the conspiracy to deal cocaine. They knew that Diaz arrived at the shopping center with Posada, spoke with him, and remained in the parking lot in a surveillance position instead of entering one of the stores in the shopping center. In addition, Diaz drove back and forth several times in front of the shopping center where Posada and Jordan exchanged the cocaine and money. While none of these actions is criminal on its face, together they did provide the trained agents with reasonable suspicion that Diaz was involved with Posada in the drug transaction. *See United States v. Cruz*, 909 F.2d 422, 424 (11th Cir.1989) (reasonable suspicion justified a *Terry* stop of the defendant when she was walking and talking with known drug dealers who were known to be at the scene to buy and sell cocaine).

This reasonable suspicion justified the initial stop of Diaz because the stop was, at first, an investigatory *Terry* stop rather than an arrest. There is no clear line separating arrests from *Terry* stops; the character of the seizure depends on the nature and degree of intrusion under the totality of the circumstances. *United States v. Roper*, 702 F.2d 984, 985 (11th Cir.1983). The agents initially stopped Diaz not to arrest him, but to investigate his presence at the shopping center, conversation with Posada, and unusual driving pattern. *Cf. United States v. Espinosa-Guerra*, 805 F.2d 1502, 1509 (11th Cir.1986) (the law enforcement purpose to be served by the detention is a factor in separating arrests from *Terry* stops). At first, the agents merely stopped Diaz, patted him

down, and asked him to identify himself. This was a reasonable, and not overly intrusive, way to investigate their suspicion of criminal activity. The investigatory stop did not become an arrest merely because the agents drew their guns and patted Diaz down after he exited his truck and made a move toward his hip. *See Franklin*, 972 F.2d at 1256–57 (*Terry* stop not necessarily converted into an arrest when police draw weapons for purposes of safety). Drug dealing is known to be extremely violent, and this was a reasonable way for the agents to protect themselves from a possible concealed weapon.

In sum, the initial stop of Diaz was a legitimate *Terry* stop justified by reasonable suspicion.[2] During a *Terry* stop, officers may ask a suspect to identify himself or herself. *See Terry*, 392 U.S. at 7, 30–31, 88 S.Ct. at 1872, 1885. In this case, the agents' request for identification and basic personal information was reasonable. Therefore, the agents properly gained knowledge of Diaz's voice when he responded to their request. We affirm the trial court's denial of the motion to suppress evidence of Agent Jordan's recognizing Diaz's voice.

### Arrest of Diaz

Although the initial stop of Diaz was only a *Terry* stop, it soon blossomed into a full scale arrest. After Agent Jordan recognized Diaz's voice as that of "George," the agents clearly would not have let Diaz leave their custody. Diaz was under arrest at that point, even though no one had yet said the words, "you are under arrest." The character of a seizure as arrest or *Terry* stop depends on the nature and degree of intrusion, not on whether the officer pronounces the detainee "under arrest." *Dunaway v. New York*, 442 U.S. 200, 212, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979). After Agent Jordan recognized Diaz's voice, the purpose of the detention grew more serious. *Cf. Espinosa-Guerra*, 805 F.2d at 1509. The

**2.** Because we have determined that the initial stop of Diaz was a *Terry* stop rather than an arrest, we need not address Diaz's argument

that the stop was improper because it was not supported by probable cause.

agents were no longer investigating just an unusual driving pattern and presence near a controlled delivery of cocaine; at this point, they also were investigating "George," one of the architects of the transaction. In fact, after Agent Jordan recognized Diaz's voice, he advised Diaz of his *Miranda* rights. Mirandizing a detainee does not convert a *Terry* stop into an arrest, but in this case it is evidence that the nature of the detention had grown more serious and that the agents did not intend to release Diaz from their custody.

■■■■ Having determined that the initial *Terry* stop developed into a full scale arrest after Agent Jordan recognized Diaz's voice as that of "George," the next question is whether this arrest was supported by probable cause. We find that it was. "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *United States v. Gonzalez,* 969 F.2d 999, 1002 (11th Cir. 1992). Because probable cause is determined from the totality of the circumstances, *id.,* information obtained during a *Terry* stop can be the basis of probable cause for an arrest, even if probable cause did not exist at the time of the initial stop. In this case, Agent Jordan recognized Diaz's voice as that of "George" during the *Terry* stop. We find that this recognition of Diaz's voice, coupled with the circumstances that created a reasonable suspicion for the *Terry* stop, gave the agents probable cause to believe that Diaz was involved in the crime of distributing cocaine. Therefore, the arrest of Diaz was proper.

*Searches Incident to Arrest*

■■■■ Because Diaz's arrest was proper, the search of the passenger compartment of his truck was proper as a search incident to an arrest. When officers lawfully arrest an automobile occupant, they may search the passenger compartment of the automobile as a contemporaneous incident of the arrest, and they also may examine the contents of containers found in the automobile. *New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981). The purpose for a search incident to arrest is to find weapons that the suspect may use to injure police officers and to collect and preserve evidence. *Michigan v. Long,* 463 U.S. 1032, 1049–50 n. 14, 103 S.Ct. 3469, 3481 n. 14, 77 L.Ed.2d 1201 (1983); *Belton,* 453 U.S. at 457, 460 n. 3, 101 S.Ct. at 2864 n. 3. This purpose defines the permissible scope of an automobile search incident to an arrest. *Florida v. Jimeno,* —— U.S. ——, ——, 111 S.Ct. 1801, 1804, 114 L.Ed.2d 297 (1991) ("The scope of a search is generally defined by its expressed object.").

■■■■ The simple search that Agent Anaipakos performed in this case was well within the scope allowed by *Belton.* Anaipakos confined his search to the passenger compartment of the truck. He looked under the seats and on the floor of the truck, but did not rip the upholstery, look under the hood, or damage the truck in any way. This was a reasonable search incident to arrest in light of the agents' need to protect themselves and to collect and preserve evidence.[3] Therefore, there was no Fourth

---

**3.** Even if this search had not been contemporaneous with Diaz's arrest, and so not qualified as a search incident to arrest, it still would have been reasonable because Diaz freely and voluntarily consented to it. After Diaz identified himself to Agents Jordan and Anaipakos, Anaipakos asked Diaz, "May we look in the truck?" Diaz responded, "Okay." The agents did not coerce Diaz to consent. There were no threats, abusive language, handcuffs, or any other physical restraint. *Cf. United States v. Espinosa–Orlando,* 704 F.2d 507, 513 (11th Cir.1983) (consent to search defendant's car and suitcase was free and voluntary when defendant was lying face down in the grass near a roadway, three police had

just reholstered their guns, and the fourth was still brandishing his weapon).

Moreover, the analysis of the reasonableness of this search is not changed by Agent Anaipakos' momentarily interrupting the search to move his car. Anaipakos had to move his car because it was blocking the entrance to the convenience store parking lot. This necessary and brief interruption did not terminate his search of the truck. Therefore, when Anaipakos resumed the search, he did not act beyond the scope of Diaz's consent, or beyond the scope of a permissible automobile search incident to an arrest.

Amendment violation in removing Diaz's beeper from the truck.

Moreover, the agents acted reasonably in inserting batteries into the beeper and calling it to see if it would ring when "George's" beeper number was dialed. The agents had probable cause to believe that the beeper was connected to criminal activity. It is commonly known that drug dealers often use beepers to conduct their business. In particular, the agents knew that "George" had used a beeper to arrange the transaction with Jordan. They also knew that Diaz had been wearing the beeper, fully assembled, moments before it appeared on the floor of the truck, dysfunctional for lack of batteries. Although no one saw how the beeper got from Diaz's belt to the floor of his truck, this was suspicious enough to warrant reactivating and testing the beeper. *Cf. United States v. Hastamorir,* 881 F.2d 1551, 1557 (11th Cir.1989) (police had probable cause to arrest defendant after they observed him talk to men who proceeded directly from the conversation to a car loaded with drugs, and observed him drop an apparent drug ledger and attempt to conceal it by kicking it under a car).

By inserting batteries into the disassembled beeper, the agents conducted a non-intrusive field test to determine whether this was the beeper of "George," the person who arranged the transaction with Agent Jordan. Because it could not respond to a call without batteries, the agents had to reactivate the beeper in order to gain this information from it. This procedure was similar to the accepted law enforcement practice of conducting simple chemical field tests to determine the identity of a substance, e.g. applying a Valtox test to see how a substance reacts chemically, or tasting a powder to see if it is cocaine. *Cf. Hayes v. Florida,* 470 U.S. 811, 817, 105 S.Ct. 1643, 1647, 84 L.Ed.2d 705 (1985) (endorsing fingerprinting a detainee during a valid *Terry* stop "if there is a reasonable basis for believing that fingerprinting will establish or negate" the detainee's connection with the suspected criminal activity). This non-intrusive field test of the beeper was reasonable in light of the agents' probable cause to believe that the beeper was connected to criminal activity.

Moreover, actually calling a beeper does not violate the Fourth Amendment under any circumstances. There simply is no reasonable expectation of privacy in not having a beeper called. A "reasonable expectation of privacy" requires a subjective expectation of privacy that society is prepared to recognize as reasonable. *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). In this case, Diaz could not have had a subjective expectation of privacy in his beeper number because he had given it to Agent Jordan. *See Smith,* 442 U.S. at 743–44, 99 S.Ct. at 2582 ("a person has no legitimate expectation of privacy in information he voluntarily turns over to other parties"). However, even if Diaz had had a subjective expectation of privacy, it would not have been reasonable. The only reason to obtain a beeper is to allow other people to call it. Beepers are obtained with the expectation, even the purpose, of letting other people call them. Therefore, there is no reasonable expectation of privacy in not having a beeper called, and calling a beeper does not implicate Fourth Amendment concerns.

In sum, the search of Diaz's truck and the reactivation and test of Diaz's beeper were reasonable. We therefore affirm the trial judge's denial of the motion to suppress evidence of the beeper's sounding when agents dialed "George's" beeper number. In addition, we affirm the denial of the motion to suppress evidence of the scraps of paper found in Diaz's wallet and address book. Since we have determined that Diaz's arrest was proper, it follows that the search of Diaz's person was reasonable as a search incident to arrest. *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973) ("[I]n the case of a lawful custodial arrest a full search of the person is ... a "reasonable" search under [the Fourth] Amendment."); *Chimel v. California,* 395 U.S.

752, 762–63, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969).

### Admissibility of Extrinsic Evidence

We now turn to the trial court's ruling admitting evidence of Diaz's 1988 arrest for possession of marijuana with intent to distribute to show his criminal intent in the present case. Defendant Diaz objected to the ruling, arguing that the evidence could not be used to prove intent because his intent was not at issue in this case. Diaz noted that his defense consisted of a claim that he simply was not involved in drug-related activities. Therefore, because this defense did not focus on the character of Diaz's intent, his intent was not at issue in the case and the only possible use for this evidence was an impermissible propensity argument. Diaz's objection is without merit. We review the trial judge's ruling for an abuse of discretion, *United States v. Miller*, 959 F.2d 1535 (11th Cir.) (en banc), *cert. denied*, —— U.S. ——, 113 S.Ct. 382, 121 L.Ed.2d 292 (1992) and find it consistent with the caselaw of this Circuit.

■ The admissibility of evidence of Diaz's 1988 arrest is controlled by Federal Rule of Evidence 404(b).[4] First established by *United States v. Beechum*, 582 F.2d 898 (5th Cir.1978) (en banc), the test for admissibility under this rule now has three parts. First, the evidence must be relevant to an issue other than the defendant's character. Second, as part of the relevance analysis, the evidence must be sufficient to support a finding that the defendant actually committed the extrinsic act. Third, the probative value of the evidence must not be substantially outweighed by unfair prejudice. *Miller*, 959 F.2d at 1538. *See also Huddleston v. United States*, 485 U.S. 681, 689, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988).

■ We find that evidence of Diaz's 1988 arrest for possessing marijuana with intent to distribute was relevant to the issue of his intent to conspire to possess and distribute cocaine in the present case. The intent elements of these two offenses were identical: possession with intent to distribute. The only difference between the two offenses, the type of drug involved, is not material. *See United States v. Hernandez*, 896 F.2d 513, 522 (11th Cir.1990) (finding admissible evidence of defendant's prior marijuana dealing to prove intent in his trial for conspiracy to possess, and possession of, cocaine with intent to distribute); *United States v. Cardenas*, 895 F.2d 1338, 1342 (11th Cir.1990). We agree with the old Fifth Circuit that evidence of prior drug dealings, such as Diaz's 1988 possession of marijuana with intent to distribute, is highly probative of intent in later charges of conspiracy and distribution of a controlled substance. *United States v. Hitsman*, 604 F.2d 443, 448 (5th Cir.1979).[5]

■ Having determined that evidence of Diaz's 1988 arrest was probative of his intent regarding the charged offense, relevance analysis requires that we next consider the materiality of the issue of Diaz's intent. *See* F.R.E. 401. Despite Diaz's argument to the contrary, his intent was always a material issue. When a conspiracy defendant pleads not guilty, he or she "makes intent a material issue in the case and imposes a substantial burden on the government." *Cardenas*, 895 F.2d at 1342. Therefore, the government may introduce evidence of the defendant's extrinsic acts to prove intent if the defendant does not "affirmatively take the question of intent out of contention by stipulating … [to] the requisite intent." *United States v. Costa*, 947 F.2d 919, 925 (11th Cir.1991). *See also United States v. Roberts*, 619 F.2d 379, 383 (5th Cir.1980) (indication that defendant

---

**4.** Federal Rule of Evidence 404(b) provides that [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

F.R.E. 404(b) (1991 Revised Edition).

**5.** The Eleventh Circuit in *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

would not "actively contest the issue" of intent does not remove the intent issue from the case). In this case, far from stipulating to the requisite intent, Diaz's "non-participation" defense focused squarely on intent. The question in this case was not *whether* Diaz was present at the shopping center during the cocaine transaction with Agent Jordan; he clearly was. The question was *why* Diaz was at the shopping center during the transaction. Was he there in order to observe or supervise the transaction, or merely by coincidence? This is a question of Diaz's intent.

However, even if Diaz's "non-participation" defense had not involved a question of intent, it still would not preclude the admission of evidence of Diaz's 1988 arrest to show criminal intent. A defendant's strategic decision not to focus the defense on the intent issue falls far short of a stipulation that the defendant possessed the requisite intent. Focusing the defense on an issue other than intent does not reduce the prosecution's burden to prove intent beyond a reasonable doubt. *Id.* at 383. Likewise, it should not prohibit the prosecution from meeting that burden with otherwise admissible evidence.

Proceeding to the second part of the *Beechum* test for admissibility under Rule 404(b), we consider whether the evidence of Diaz's 1988 arrest was sufficient to support a factual finding that Diaz actually committed the offense of possessing marijuana with intent to distribute. Generally, evidence of an arrest without a conviction is not sufficient to prove commission of an offense. However, in this case, Diaz does not dispute that he actually committed this extrinsic offense, and we conclude that there is ample evidence to support such a finding.

█ The final part of the *Beechum* test requires that the probative value of the extrinsic act evidence not be substantially outweighed by any unfair prejudice caused by that evidence. In determining whether this part of the test is satisfied, a court should consider the differences between the charged and extrinsic offenses, their temporal remoteness, and the govern-

ment's need for the evidence to prove intent. *Cardenas*, 895 F.2d at 1343–44. The charged and extrinsic offenses in this case were identical, except for the type of narcotic involved, and they were separated by only two years. With regard to the government's need for this evidence, we note "the special difficulty of proving intent in conspiracy cases." *United States v. Pollock*, 926 F.2d 1044, 1048 (11th Cir.1991). In addition, the government's case on intent was weak. The agents did not overhear any conversation between Diaz and his co-conspirator, Posada, that would prove Diaz's intent regarding the transaction with Agent Jordan. In sum, the government had a strong need for this extrinsic act evidence because Diaz denied any connection with the transaction at issue, and there were no overwhelmingly credible witnesses to testify to Diaz's intent to distribute cocaine. *Cf. Cardenas*, 895 F.2d at 1344 (the government's need to introduce extrinsic act evidence "could not have been questioned" because the defendant denied any connection with the transaction at issue and the government lacked any "overwhelmingly credible sources" on the issue of the defendant's intent).

While the probative value and government need for this evidence were strong, any unfair prejudice possibly caused by its introduction was mitigated by the trial judge's limiting instructions. Both when the evidence was presented and in his final charge to the jury, the trial judge cautioned that this evidence could be used only on the issue of intent, and not along the prohibited propensity line of reasoning. Any unfair prejudice caused by this evidence did not substantially outweigh its probative value. Because all parts of the *Beechum* test are satisfied, we find that evidence of Diaz's 1988 arrest was properly admitted to prove his intent in the charged offense.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of defendant Diaz's motion to suppress and AFFIRM the district court's ruling admitting extrinsic act evidence on the issue of Diaz's criminal

intent. The judgment is, in all respects, AFFIRMED.