**UNITED STATES of America,**

v.

**Eric VIRDEN, Defendant**

**No. 4:05–CR–22(CDL).**

United States District Court,
M.D. Georgia,
Columbus Division.

March 3, 2006.

Melvin E. Hyde, Jr., Columbus, GA, for United States of America.

Janice A. Singer, Atlanta, GA, for Defendant.

*ORDER*

LAND, District Judge.

Presently pending before the Court is Defendant Eric Virden's Motion to Suppress evidence gathered in the course of the seizure of Virden and his vehicle on May 4, 2005 (Doc. 36). Specifically, Virden moves to suppress all documents from the vehicle, physical items from the vehicle, and Virden's fingerprint evidence. Virden contends that the initial stop was impermissible, that he was subjected to an illegal arrest, and that his vehicle was seized illegally. The Government argues that the detention of Virden and his vehicle was legal and that the evidence should not be suppressed. For the reasons set forth below, Virden's Motion to Suppress is granted in part and denied in part.

## BACKGROUND FACTS

On May 4, 2005, Metro Narcotics Task Force law enforcement officers, along with agents from various federal agencies, were preparing to begin a coordinated execution of nine separate search warrants at locations throughout Columbus, Georgia. The search warrants were the result of one and a half years of police work investigating, *inter alia*, Virden's co-defendant, Michael Adams, who was suspected of illegal drug activity.[1]

As part of this coordinated effort, Metro Narcotics officers were surveilling a residence located at 1929—17th Avenue in Columbus, Georgia-a townhouse with an attached garage-which was the target of one of the search warrants. Although law enforcement officers had observed Adams at the townhouse on a number of occasions prior to May 4, 2005, they did not believe that he (or anyone else) resided there full time. On May 4, 2005, prior to the execution of the search warrant, an officer surveilling the townhouse noticed the garage door of the townhouse open and saw a previously unidentified vehicle, a Buick LeSabre, exit the garage. The garage door then closed, and the LeSabre, driven by a black male, pulled away. The officers surveilling the townhouse did not see anyone inside the townhouse to close the garage, so they believed that it was closed electronically by the driver of the LeSabre. The law enforcement officers did not stop the Lesabre at that point because there were no marked law enforcement vehicles in the vicinity. Instead, two Metro Narcotics officers followed the LeSabre in an unmarked car.

After driving for approximately fifteen minutes, the LeSabre, followed by the officers in the unmarked car, turned in to a BP station-convenience store at the corner of Flat Rock Road and J.R. Allen Parkway.[2] Sgt. Stinson of the Metro Narcotics Task Force, who had been in radio contact with the other officers regarding the LeSabre, arrived at the BP station shortly thereafter. The driver, Virden, exited the LeSabre and went inside the convenience store, where he selected several items,

1. Virden's name never surfaced during the investigation, and he was a "complete unknown" to Metro Narcotics prior to May 4, 2005. His name did not appear in the search warrant affidavit, and the vehicle he was driving was not listed in the search warrant as a vehicle to be searched.

2. At some point-either while the vehicles were en route or while they were stopped at the BP station-the officers learned that the LeSabre was a rental car. There is no evidence that

the officers took any action based on the car's status as a rental vehicle. Virden had not rented the car himself-it was rented by his friend, Ms. Quandanika Taylor. Ms. Taylor rented the car on Virden's behalf because Virden's car had broken down and Virden did not have a credit card to rent a car himself. Although Virden was not listed as an authorized driver on the rental agreement, Ms. Taylor rented the car for him to use and gave him permission to use it.

waited in line, and paid for the items in an orderly fashion. When Virden exited the convenience store and returned to the LeSabre, one of the officers who had followed him from the 17th Avenue location approached him. This was Officer Jeffrey Fegreus, a uniformed reserve deputy with the Muscogee County Sheriff's Department. Officer Fegreus identified himself to Virden and asked Virden to wait with him until Sgt. Stinson arrived because Sgt. Stinson wanted to speak with him. Sgt. Stinson arrived, and Officer Fegreus left Virden and Sgt. Stinson to speak. Sgt. Stinson identified himself, showed Virden his badge and told Virden he was conducting a drug investigation. Sgt. Stinson asked Virden for his identification, which Virden provided.[3] Sgt. Stinson frisked Virden to make sure that he had no weapons.

Sgt. Stinson asked Virden where he had just been. Virden told Sgt. Stinson that he had been at his girlfriend's house on 22nd or 23rd Street, although he was not sure of the exact address and did not know the area because he was from out of town. Sgt. Stinson then asked Virden if he had just come from a townhouse on 17th Avenue. Virden said no. This reply made Sgt. Stinson suspicious because he knew that Virden had just come from the 17th Avenue townhouse. Sgt. Stinson decided that he wanted to have a canine unit come to sniff around Virden's vehicle for illegal drugs.

At this point, the law enforcement officers in the BP station parking lot saw Defendant Adams in his car enter the parking lot of the Wendy's restaurant across the street from the BP. Believing that Virden might be connected in some way to Adams based on his visit to the 17th Avenue townhouse that morning, the officers feared that the execution of the search warrants might be compromised if Adams saw Virden speaking with law enforcement officers. Therefore, they decided to conceal Virden. They handcuffed Virden for officer safety and placed him in the back of a patrol car. After Adams left the Wendy's parking lot, the law enforcement officers with Virden at the BP station learned that the only available drug dog was in a marked law enforcement vehicle that was needed to pull over Defendant Adams's car, which had entered the Beaver Run neighborhood. They also learned that the drug dog was needed to search a residence on Beaver Trail in the Beaver Run neighborhood (another target of the search warrants to be executed that day) and was unavailable to come to the BP station to check Virden's vehicle within a short period of time.

The officers decided to take Virden to the drug dog, which was at the residence on Beaver Trail. They drove Virden, still handcuffed and in the back of the police car, approximately one or two miles to the Beaver Trail location. Sgt. Stinson took Virden's car keys and drove Virden's car to the Beaver Trail location. Virden did not consent to being transported to the Beaver Trail location, and he did not consent to have his car searched or driven to the Beaver Trail location. When Virden and the officers arrived at the Beaver Trail location, both the drug dog and the handler were there, and the drug dog "checked the seams" of Virden's vehicle. The drug dog alerted to the presence of drugs in the vehicle.[4] Sgt. Stinson esti-

---

3. Sgt. Stinson did not recall whether he returned the identification to Virden while they were in the BP parking lot or retained it until a later time.

4. It is undisputed that the drug dog's alert provided probable cause to search the LeSabre. A key question, *discussed infra*, is whether the sniff was conducted while Virden was unlawfully detained or his car was unlawfully seized.

mated that from the time of his initial encounter with Virden to the drug dog alert approximately twenty to thirty minutes elapsed and that Virden spent around five minutes handcuffed in the back of the police car. After the drug dog alerted to the presence of drugs in Virden's vehicle, the law enforcement officers searched Virden and his vehicle. The search resulted in the seizure of approximately four kilograms of cocaine, keys, documents, currency, and other items. Virden was taken into custody and was fingerprinted.

## DISCUSSION

### 1. *Seizure of Virden:* Terry *Stop or Arrest?*

The Government contends that the stop and detention of Virden was a brief detention to effectuate a *Terry* stop, *see Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and that the officers had a reasonable suspicion that Virden was involved in criminal activity to justify the detention. In the alternative, the Government contends that the officers had probable cause to arrest Virden at the BP station, so the detention was permissible even if the Court finds that the *Terry* stop matured into an arrest when the officers transported Virden to the search location on Beaver Trail. Virden counters that the initial stop was impermissible because the officers did not have reasonable suspicion to detain him and that even if the initial stop was a valid *Terry* stop, the stop matured into an arrest at some point before the officers had probable cause to arrest him.

In general, the Fourth Amendment to the United States Constitution, applicable to the states by virtue of the Fourteenth Amendment, "prohibits state actors from making searches or seizures of the person in the absence of probable cause." *United States v. Dunn,* 345 F.3d 1285, 1288 (11th Cir.2003) (citing *United States v. Sharpe,*

470 U.S. 675, 690, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)). A seizure of the person within the meaning of the Fourth Amendment occurs when, "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp v. Texas,* 538 U.S. 626, 629, 123 S.Ct. 1843, 155 L.Ed.2d 814, (2003) (internal quotations omitted). In this case, there is no question that Virden was "seized" when he was handcuffed, placed in the back of a police car, and driven to a police investigative site one or two miles away from the BP station. The question, therefore, is whether this seizure falls within an exception to the probable cause requirement and may be justified on something less than probable cause. *See Terry,* 392 U.S. at 30, 88 S.Ct. 1868 (holding that minimally intrusive searches and seizures of the person are permissible if the officer has a reasonable suspicion, supported by articulable facts, that "criminal activity may be afoot"). The Court finds that the seizure of Virden does *not* fall within an exception to the probable cause requirement.

The courts use a two-step inquiry for evaluating the reasonableness of an investigative stop. *See United States v. Acosta,* 363 F.3d 1141, 1144 (11th Cir.2004). The first step is to determine "whether the officer's action was justified at its inception," and the second step is to determine "whether the stop went too far and matured into an arrest." *Id.* at 1144–45.

Regarding the first step, the officers were allowed to stop Virden if, under the totality of the circumstances, they had "an objectively reasonable suspicion" that Virden "had engaged, or was about to engage, in a crime." *Id.* at 1145. Reasonable suspicion requires more than an un-

particularized suspicion or hunch-it requires "at least a minimal level of objective justification for making the stop." The officers in this case knew that Virden had access to and had come directly from a residence which was the target of a search warrant based on suspected drug activity and which officers believed, based on several months of surveillance, was a location for drug activity and was not a primary residence for anyone.[5],[6] The Court recognizes that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). However, in this case, officers had probable cause to believe that the townhouse was a location for drug activity, and they had a warrant authorizing them to search the townhouse for contraband. Virden and the LeSabre were inside the garage of the townhouse with the door closed before the LeSabre left the townhouse. When Virden drove the LeSabre out of the garage, it appeared to officers that he closed the garage door using an electronic remote. Putting all of these circumstances together, the Court finds that the officers had an objectively reasonable suspicion that Virden was involved in criminal drug activity when they stopped him.

■ As for the second step, the Court must determine " 'whether [the stop] was reasonably related in scope to the circumstances which justified the interference in the first place.' " *Acosta*, 363 F.3d at 1145 (quoting *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)). "There is no clear line separating arrests from *Terry* stops; the character of the seizure depends on the nature and degree of intrusion under the totality of the circumstances." *United States v. Diaz–Lizaraza*, 981 F.2d 1216, 1221 (11th Cir.1993). In each individual case, the courts must determine where the line of demarcation is-by weighing a "limited violation of individual privacy involved against the opposing interests in crime prevention and detection and in the police officer's safety." *Acosta*, 363 F.3d at 1146. The Eleventh Circuit applies four non-exclusive factors to assist in drawing the line between a *Terry* stop and an arrest: 1) the law enforcement purposes served by the detention, 2) the diligence with which the police pursue the investigation, 3) the scope and intrusiveness of the detention, and 4) the duration of the detention. *Id.*

■ In analyzing the first factor, the most important consideration is "whether the police detained [Virden] to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference." *Id.* The relevant inquiry here is whether the officers utilized "brief, minimally intrusive investigation techniques appropriate under *Terry*." *Id.* (internal punctuation omitted). It is well established that the use of a drug-sniffing dog is an acceptable investigative technique that can be performed in a minimally intrusive manner. *See U.S. v.*

---

5. *After* he was patted down for weapons, Virden lied to Sgt. Stinson about where he had just been, further arousing Sgt. Stinson's suspicions. However, Sgt. Stinson made the initial stop without this information.

6. Sgt. Stinson also asserted that Virden's general path in the direction of the Beaver Trail location made him suspect that Virden was involved in criminal activity because it appeared to Sgt. Stinson that Virden was driving toward the Beaver Trail location. The Court is unpersuaded, however, that Virden's route on Manchester Expressway (GA–85) and his stop on J.R. Allen Parkway (U.S.80)— both highways from which Virden could have traveled to a plethora of destinations-supports a finding of reasonable suspicion of criminal activity.

*Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). Furthermore, *Terry* may, under certain circumstances, permit officers to handcuff and detain a suspect in a police car for a limited amount of time. *See United States v. Gil,* 204 F.3d 1347, 1351 (11th Cir.2000). However, the officers in this case did not merely handcuff and detain Virden at the scene of the stop and await the arrival of the drug-sniffing dog. Rather, they transported Virden, without his consent, to a police investigative site a mile or two away.[7] This certainly cannot be considered minimal interference. The law is clear that the officers could not, based solely on reasonable suspicion, forcibly remove Virden from a place in which he was entitled to be, transport him to a police station, and detain him there, even briefly. *See Kaupp,* 538 U.S. at 630, 123 S.Ct. 1843 (finding that removal of person from his home to police station was sufficiently like arrest to require probable cause); *Hayes v. Florida,* 470 U.S. 811, 816, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985) (same); *see also Dunaway v. New York,* 442 U.S. 200, 212–13, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (finding that removal of person from neighbor's home to police station was arrest). The Court sees little distinction between transporting Virden to a police station for further investigation and transporting him to a police investigative site with which, as far as officers knew at the time, Virden had absolutely no connection. *Cf. United States v. Hardy,* 855 F.2d 753, 760–61 (11th Cir.1988) (noting that had officer driven detainees to restaurant to wait until drug dog was available to come to stop location, "he might well have converted the *Terry* stop into an arrest requiring probable cause"). Accordingly, the Court finds that this factor weighs heavily in favor of Virden.

Similarly, the Court finds that the third factor-scope and intrusiveness of the detention-weighs in favor of Virden. Under this factor, the courts ask "whether the scope and intrusiveness of the detention exceeded the amount reasonably needed by police to ensure their personal safety." *Acosta,* 363 F.3d at 1146. Again, had officers merely handcuffed and detained Virden, such action might well have been permissible under the circumstances to effect the stop and ensure safety of the officers. *Id.* However, the involuntary transport of Virden to the police investigative site at Beaver Trail makes this qualitatively different from a simple detention, and the Court cannot conclude that this intrusion on Virden's personal liberty was reasonably necessary to effect the stop and

---

**7.** The Court notes that the defendant in *Gil* was transported a short distance (a few blocks) from the stop location in a police car and detained for 75 minutes. *See Gil,* 204 F.3d at 1349. In *Gil,* the officers were surveilling the defendant's home based on their belief that a drug transaction was being conducted inside. While some of the suspected parties to the transaction were still inside the home, the officers saw the defendant exit, carrying two plastic bags, and drive away in her car. Before she got more than a few blocks from her home, the officers stopped her. She gave the officers consent to search the car, and they found $12,500 in one of the plastic bags. After the search of the car, the officers transported the defendant back to the area outside her home and detained her for 75 minutes, until the home was secured. The purpose of the detention was to maintain the safety of the officers and the ongoing investigation of the residence. While noting that the police likely had probable cause to arrest the defendant, *see id.* at 1350 n. 2, the Eleventh Circuit upheld the detention under *Terry,* although it did not address the transportation aspect in its analysis of the manner of the detention. *See id.* at 1350–51. The Court finds that the transportation of the *Gil* defendant-a few blocks back to her home which she had exited just moments before carrying suspected contraband-is significantly different from driving a suspect more than a mile to a police investigative site which police have no reason to associate with the suspect.

ensure the safety of the officers at the scene.

As for factors two and four—diligence in pursuing the investigation and duration of the detention—these factors weigh in favor of the officers. First, under factor two, the courts ask whether the officers "were diligent in pursuing their investigation, that is, whether the methods the police used were carried out without unnecessary delay." *Id.* Nothing in the record indicates that the officers were less than prompt in carrying out the investigation. Under factor four, the courts ask whether the duration of the detention was reasonable. *Id.* at 1147. The entire detention—from the time Sgt. Stinson approached Virden to the time the drug dog alerted to the presence of drugs in the LeSabre—was between twenty and thirty minutes. A thirty minute duration "is not beyond the pale of reasonableness for *Terry* stops." *Id.* at 1148. For these reasons, both factors two and four weigh in favor of the officers.

In sum, we have in this case a serious intrusion on personal liberty that apparently did not take an inordinate amount of time. The Court declines to find that such an intrusion is permissible under *Terry* simply because it was relatively short in duration. *See Hayes,* 470 U.S. at 816, 105 S.Ct. 1643 (noting that even brief detention crosses *Terry* line when person is forcibly removed from his home and transported to police station). Rather, the Court views this involuntary transport of Virden to the police investigative site as "sufficiently like arrest to invoke the traditional rule that arrests may constitutionally be made only on probable cause." *Kaupp,* 538 U.S. at 630, 123 S.Ct. 1843. To find otherwise would permit the narrow "*Terry* exception" to swallow the "Fourth Amendment probable cause rule."

■ Having found that the stop of Virden did mature into a *de facto* arrest for which probable cause was necessary, the next question is whether the officers had probable cause to arrest Virden. "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *Diaz–Lizaraza,* 981 F.2d at 1221. At the time of the *de facto* arrest in this case, the officers had the following information: 1) Virden had access to and driven directly from the 17th Avenue townhouse, a location which officers had probable cause to believe was the site of drug activity and 2) that Virden told them he had come from a house on 22nd or 23rd Street and maintained that position even though he was presented with an opportunity to correct it. The Court cannot find that these circumstances gave the officers probable cause to believe that Virden was involved in illegal *drug* activity. However, the inquiry does not end there.

In its supplemental brief following the January 31, 2006 hearing on Virden's Motion to Suppress, the Government argued, for the first time, that even if the Court did not find that the officers had probable cause to arrest Virden on drug charges, the officers had probable cause to arrest Virden for misdemeanor obstruction of a law enforcement officer under Georgia law. Obstruction of a law enforcement officer occurs when a person "knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties." O.C.G.A. § 16–10–24(a). The essential elements of this offense are (1) an act constituting obstruction or hindering (2) done knowingly and wilfully, (3) to an officer lawfully discharging his official duties. *Weidmann v. State,* 222 Ga. App. 796, 797, 476 S.E.2d 18, 20 (1996). The statute " 'was made purposefully broad to cover actions which might not be otherwise unlawful, but which obstructed or hindered law enforcement officers in

carrying out their duties.'" *Id.* (quoting *Carter v. State*, 188 Ga.App. 464, 465, 373 S.E.2d 277 (1988)). Lying to a law enforcement officer with the intent of misdirecting an officer may constitute misdemeanor obstruction. *See Wilson v. State*, 261 Ga.App. 576, 578, 583 S.E.2d 243, 245 (2003) (finding obstruction where suspect named Wilson told officers who were looking for suspect named Wilson that his name was Brown and provided false social security number); *Duke v. State*, 205 Ga. App. 689, 690, 423 S.E.2d 427, 428 (1992) (noting that willfully lying about location of arrestee to officer attempting to execute arrest warrant constitutes obstruction). The question whether a defendant's actions actually hinder or impede an officer is for the trier of fact. *Sapp v. State*, 179 Ga.App. 614, 615, 347 S.E.2d 354, 355 (1986). Georgia law also makes *attempt* a criminal offense: "A person commits the offense of criminal attempt when, with intent to commit a specific crime, he performs any act which constitutes a substantial step toward the commission of that crime." O.C.G.A. § 16-4-1. Factual or legal impossibility is not a defense to a charge of criminal attempt so long as the crime "could have been committed had the attendant circumstances been as the accused believed them to be." O.C.G.A. § 16-4-4.

In the instant case, when the officers handcuffed Virden, placed him in the back of the patrol car and transported him to the search location at Beaver Trail, they knew that he had access to and had driven directly from the 17th Avenue townhouse, located in the 1900 block of 17th Avenue. They also knew that Virden told them he had come from a house on 22nd or 23rd Street and that he maintained that position even though he was presented with an opportunity to correct it. Based on these facts known to the officers, the Court finds that the officers had probable cause to arrest Virden for obstruction or, at the very least, attempted obstruction.

That the officers ostensibly arrested Virden for drug activity-and that they later formally arrested him for drug activity-is irrelevant: "Those are lawfully arrested whom the facts known to the arresting officers give probable cause to arrest." *Devenpeck v. Alford*, 543 U.S. 146, 155, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004) (noting that arrest can be lawful under Fourth Amendment even though criminal offense for which there is probable cause to arrest is not "closely related" to offense stated by arresting officer at time of arrest). Therefore, the Court finds that the officers' detention of Virden at the BP station was not an illegal arrest. For these reasons, Virden's Motion to Suppress is denied as to the evidence gathered as a result of the seizure of Virden's person.

**2. Seizure of the LeSabre: Was it Lawful?**

■ The next question is whether the officers' seizure of the LeSabre was lawful.[8] Having found that there was no

---

**8.** As a preliminary matter, the Court must address the issue of standing to challenge the search of the car. A person has standing to challenge a search if he manifests "a subjective expectation of privacy in the invaded area that 'society is prepared to recognize as reasonable.'" *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir.1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 & n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). The Government does not dispute Virden's subjective expectation of privacy in the LeSabre. As to the second part of the inquiry, the Court must determine whether Virden had a reasonable expectation of privacy in the LeSabre. As discussed *supra* note 2, Virden was not the owner or the renter of the LeSabre, although he did have permission from the renter to use it. A driver using a borrowed vehicle with the permission of an absent owner has been found to possess a reasonable expectation of privacy. *See United States v. Miller*, 821 F.2d 546, 548 (11th Cir.1987); *see also United*

probable cause to believe that Virden was involved in illegal drug activity, the Court finds that there was no probable cause to search the LeSabre for contraband based on the officers' *suspicion* that Virden was involved in illegal drug activity. While it is true that the officers had probable cause to believe that the LeSabre contained contraband after the drug dog's positive alert, the seizure of the car occurred in the BP station parking lot, before the officers had probable cause based on the drug dog's alert.

The Government argues primarily that taking the LeSabre from the BP station to the Beaver Trail location was merely a detention to effectuate a *Terry* stop. It is true that a brief detention of personal property is permissible under *Terry*, so long as the detention is based upon reasonable suspicion and is properly limited in scope. *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).[9] It is clear that Sgt. Stinson seized the LeSabre when he took the keys from Virden and drove the car out of the BP station parking lot to the Beaver Trail police investigative site. Assuming that he had an objectively reasonable suspicion authorizing detention of the LeSabre, the next question is whether this seizure is within the *Terry* exception to the general rule requiring probable cause for a seizure. *See id.* at 708, 103 S.Ct. 2637. The limitations applicable to the investigative detention of a person define the permissible

scope of an investigative detention of the person's property on less than probable cause. *Id.* at 709, 103 S.Ct. 2637. Under this standard, the seizure of the LeSabre—which involved taking control of the car and driving it from the stop location to a police investigative site-exceeded the bounds of *Terry*, just as the seizure of Virden's person did. *See* § 1 *supra.* Accordingly, the Court cannot find that the seizure of the LeSabre was permissible under *Terry*.

The Government contends that even if the seizure of the LeSabre was not justified under *Terry* it was nonetheless legal because 1) it was supported by probable cause, 2) it was a search incident to arrest, 3) it was authorized under *Michigan v. Summers* and/or 4) it was an authorized inventory search incident to a lawful impoundment.

■ First, as discussed *supra*, the officers did not have probable cause to believe that Virden was involved in illegal drug activity. Likewise, prior to the seizure, the officers did not have probable cause to believe that the LeSabre contained contraband. Furthermore, the Court cannot find that the officers had probable cause to search or seize the LeSabre based on their belief that Virden committed misdemeanor obstruction. Accordingly, it is clear to the Court that the seizure of the LeSabre was not supported by probable cause.

States v. Kye Soo Lee, 898 F.2d 1034, (5th Cir.1990) (finding that driver of rental truck had reasonable expectation of privacy because he had absent renter's permission). Although Virden did not rent the car himself, the renter procured the car specifically for Virden's use and gave him permission to use it. Accordingly, the Court finds that Virden had a reasonable expectation of privacy in the LeSabre and thus has standing to challenge the search.

9. In *Place*, the officers reasonably suspected that a suspect's luggage contained narcotics. They took the luggage away from the suspect at LaGuardia Airport and transported it to Kennedy Airport for the purpose of conducting a drug dog sniff. *Place*, 462 U.S. at 699, 103 S.Ct. 2637. Because 90 minutes elapsed between the seizure and the drug dog's alert and because the officers took the bags without informing the suspect of where they would take them or how long they would keep them, the Supreme Court concluded that the seizure was impermissible. *Id.* at 710.

■ Second, the seizure of the LeSabre cannot be justified under the search incident to arrest rule. It is true that an officer who makes a lawful custodial arrest of the occupant of an automobile may, as a *contemporaneous incident* of that arrest, search the passenger compartment of the automobile. *New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *see also Thornton v. United States,* 541 U.S. 615, 622, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004) (noting that *Belton* rule allows search incident to arrest of "occupants" and "recent occupants" of vehicles). The rationale behind this rule is the need to disarm the vehicle's occupant and to prevent the occupant from concealing or destroying evidence. *Belton,* 453 U.S. at 461, 101 S.Ct. 2860. As *Belton* and its progeny make clear, a search based on these concerns is narrow in scope and may not be justified if it is not actually incidental to the arrest. *See id.* at 462, 101 S.Ct. 2860. The officers in this case did not search the car at the BP station when they effectively arrested Virden. Rather, they drove the car from the BP station to the Beaver Trail search site, where they subjected it to the drug dog sniff and later searched it. This is clearly not a search incident to arrest.

■ Third, the detention of Virden and search of the LeSabre was not permissible under *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), as the Government argues. Under *Summers,* law enforcement officers are permitted to detain an occupant of a premises subject to a valid warrant to search for contraband while the search is being conducted. *See Summers,* 452 U.S. at 705, 101 S.Ct. 2587 (applying rule to defendant who was not inside house to be searched when police stopped him-rather, he was "descending the front steps"). One rationale behind this rule is to prevent an occupant of the premises, who is present at the search's inception, from fleeing in the

event that incriminating evidence is found. *Id.* at 702, 101 S.Ct. 2587. Another important rationale is the interest in minimizing the risk of harm to the officers by occupants of a search premises, particularly because "the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." *Id.* Courts have extended *Summers* to permit officers to detain a person who departed in a car from his residence, which was the subject of a warrant to search for contraband, shortly after that departure. *See United States v. Cochran,* 939 F.2d 337, 339 (6th Cir.1991). While the court in *Cochran* noted that *Summers* does not "impose upon police a duty based on geographic proximity," it made clear that for *Summers* to apply the police must have detained the defendant "as soon as practicable after departing from his residence." *Id.* (noting that defendant in · that case was stopped "a very short distance" from his residence, "almost immediately after exiting his residence").

In this case, officers did not stop Virden as he exited the residence on 17th Avenue or a very short distance therefrom. Rather, they followed his vehicle and did not stop him or attempt to stop him until after he had driven for approximately fifteen minutes, pulled into the parking lot of a convenience store, parked his car, gone inside the store, selected several items, waited in line, paid for the items, and come back out to his car. Such a delay does not justify application of the *Summers* rule. First, the detention of Virden at the BP station was clearly not for the safety of the officers at the 17th Avenue search site-by the time ·the officers stopped Virden, he was fifteen minutes and several miles away from that location. Moreover, while the officers might have had an interest in preventing Virden's flight from the search location such that they could have validly

stopped Virden's vehicle shortly after he left the 17th Avenue townhouse, they did not do so. Rather, they made no attempt to stop Virden and prevent him from slipping off into the sunset until fifteen minutes after Virden left the 17th Avenue townhouse and stopped, of his own volition, at the BP station. For these reasons, the Court finds that *Summers* and its progeny do not justify the detention of Virden and the search of his car in this case.

■ Finally, the search of the LeSabre was not a valid inventory search. Inventory searches of lawfully impounded vehicles are an exception to the warrant requirement of the Fourth Amendment. *Colorado v. Bertine*, 479 U.S. 367, 371, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987); *South Dakota v. Opperman*, 428 U.S. 364, 376, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). For an impoundment to be lawful, the decision to impound the vehicle must be made "on the basis of standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Sammons v. Taylor*, 967 F.2d 1533, 1543 (1992) (internal quotations omitted). Furthermore, for impoundment inventory searches to be permissible, they must be made pursuant to standard police procedures.[10] *Opperman*, 428 U.S. at 376, 96 S.Ct. 3092; *see also Florida v. Wells*, 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990) (emphasizing importance of standardized criteria or established routine for inventory searches). Inventory searches must be "designed to produce an inventory" and must not be "a ruse for general rummaging in order to discover incriminating evidence." *Wells*, 495 U.S. at 4, 110 S.Ct. 1632; *see also United States v. Khoury*, 901 F.2d 948, 958 (11th Cir.1990).

There are a number of Columbus Police Department policies relevant to the instant case. Columbus Police Department policy permits impoundment of a vehicle when the driver of the vehicle has been arrested if:

1. There is no one present who is authorized and capable of removing the vehicle.

2. The driver has made no specific request as to the disposition of the vehicle.

3. The driver has made no request to use a specific wrecker service.

4. If the driver of a vehicle has made a specific request for the disposition of the vehicle or has made a request for a specific wrecker service and the officer has made a reasonable, but unsuccessful effort to comply with the request, then the impoundment of the vehicle will be proper.

5. If the driver of the vehicle has been removed from the scene and/or is either physically or mentally unable to make a request for the disposition of the vehicle for the protection of the vehicle or its contents.

6. If the driver is arrested on private property and the driver either owns or has control over the property or has permission from the property owner, the vehicle should not be impounded except upon request of the driver.

Columbus Police Department General Order 3–20.2(C). If the driver makes a specific request regarding disposition of the vehicle, "the officer must make a reasonable effort to comply with the request." Columbus Police Department General Or-

---

**10.** There are three main policy reasons for conducting inventory searches: 1) to protect the owner's property while it is in custody, 2) to insure against claims of lost, stolen, or vandalized property, and 3) to protect the police from danger. *See, e.g., Florida v. Wells*, 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990).

der 3–20.3. If a reliable person is present or called to the scene to remove the vehicle or if the driver/arrestee designates a towing service and destination for the vehicle, "it is unnecessary for the police to impound it," and any inventory conducted would be improper. Columbus Police Department General Order 3–20.5. Once the decision to impound the vehicle is validly made, the officers may conduct an inventory search of the vehicle's contents and arrange to have the vehicle towed. Columbus Police Department General Order 3–19.1. The inventory procedure includes completing a "Department Vehicle Tow/Inventory Report." Columbus Police Department General Order 3–20.6.

The Court recognizes that it is operating under a fiction in analyzing the police conduct in this case as an inventory search because the officers did not believe that they had arrested Virden when Sgt. Stinson seized the LeSabre. However, based on the evidence before the Court, it is clear that the officers probably *could* have impounded the LeSabre and conducted an inventory search when they effectively arrested Virden, assuming that Virden did not specify an alternative disposition for the LeSabre as he was entitled to do under Columbus Police Department policy. But the officers chose a path inconsistent with what they *could* have done-their course of conduct was clearly contrary to the Columbus Police Department's standardized criteria for impoundment and inventory searches. Even assuming that Sgt. Stinson could validly effectuate the impoundment by driving the LeSabre himself rather than arranging for a tow truck to come pick it up, absolutely nothing in his conduct indicates that he was conducting an inventory search. There was no inventory search to catalog the contents of the car, no inventory, and no inventory report. Nothing about the officers' conduct at the BP station was "designed to produce an inventory"-rather, it appears clear that the sole purpose of taking control of the LeSabre was to investigate whether or not it contained contraband. If the Court accepted the Government's impoundment argument, it would render meaningless the well-established rule requiring inventory searches to be made pursuant to standard procedures. *See Opperman*, 428 U.S. at 376, 96 S.Ct. 3092.

For all of these reasons, the Court finds that the seizure of the LeSabre was unconstitutional. Virden gave no consent for the seizure or search of the LeSabre. The Government has not presented any evidence that any good faith exception to the exclusionary rule applies in this case, and there is no contention that the evidence in the LeSabre would have been discovered inevitably. Therefore, the evidence gathered as a result of this unconstitutional seizure must be suppressed. *See United States v. Chanthasouxat*, 342 F.3d 1271, 1280 (11th Cir.2003) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). Accordingly, the evidence obtained from the search of the LeSabre must be suppressed as to Virden, including but not limited to the cocaine and its wrappers, any bags, documents, keys, garage door openers, personal possessions, currency, and other items contained in the LeSabre.

## CONCLUSION

For the reasons stated in this Order, Virden's Motion to Suppress (Doc. 36) is granted in part and denied in part. Specifically, the motion is denied as to the evidence gathered as a result of the seizure of Virden's person. The motion is granted as to the evidence gathered as a result of the seizure of the LeSabre.